**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

JOHN TYLER LAMBERT,

     Defendant.

No.  1:19-cr-00571 (VEC)

---

**SENTENCING MEMORANDUM OF JOHN TYLER LAMBERT**

HOWARD & HOWARD ATTORNEYS PLLC
By:   Gary A. Peters
450 West Fourth Street
Royal Oak, Michigan 48067-2557
(248) 723-0490

Dated: November 4, 2019    *Attorneys for John Tyler Lambert*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.      PRELIMINARY STATEMENT .............................................................................. 1

II.     PERSONAL BACKGROUND .................................................................................. 4

        A.      Childhood and Family ................................................................................. 4

        B.      Education ...................................................................................................... 4

III.    THE OFFENSE CONDUCT AND APPLICABLE LAW ................................. 5

        A.      Character and History of John Tyler Lambert ........................................ 8

                1.      John Tyler's Personal History and Characteristics Support a Non-
                        Custodial Sentence ......................................................................... 8

        B.      The Nature of the Offense ........................................................................ 13

IV.     THE APPLICABLE SENTENCING GUIDELINES CALCULATION RANGE .......... 13

        A.      The Guidelines Calculation ...................................................................... 14

        B.      The Court Should Depart from the Sentencing Guidelines and Impose a
                Non-Custodial Sentence Based, in Part, on John Tyler's Status as a
                Youthful Offender ..................................................................................... 14

        C.      A Non-Custodial Sentence Achieves the Sentencing Goal of Both Specific
                and General Deterrence ............................................................................ 18

V.      CONSIDERATION OF THE 3653(A) FACTORS INDICATES THAT A NON-
        CUSTODIAL     SENTENCE     INCLUDING     SUPERVISED     RELEASE,
        EXTENSIVE   COMMUNITY   SERVICE   INCLUDING   SPEAKING
        ENGAGEMENTS TO HIGH SCHOOL AND COLLEGE AGE STUDENTS IS
        APPROPRIATE ...................................................................................................... 18

        A.      John Tyler's History and the Characteristics and Nature of the Offense
                Support a Non-Custodial Sentence ......................................................... 18

        B.      A Non-Custodial Sentence is Appropriate for the Offense and is Consistent
                With Similar Results in Other Cases ....................................................... 20

                1.      A Non-Incarceration Sentence Would be Consistent with the
                        Evolving Treatment of Wire Fraud Cases in this Circuit ......... 21

                2.      A Sentence of Supervised Release Would be in Line with Sentences
                        Imposed upon Similarly Situated Defendants ............................ 23

i

C.    A Sentence of Supervised Release is Sufficient to Promote Respect for the Law and Meet the Goal of Adequate Deterrence and Protection of the Public ................................................................................................................. 25

VI.   CONCLUSION ............................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................................................ 6, 7, 13

*Koon v. United States*,
   518 U.S. 81 (1996) ...................................................................................................... 5

*Molina–Martinez v. United States,*
   136 S.Ct. 1338 (2016) ................................................................................................. 5

*Pepper v. United States*,
   131 S. Ct. 1229 (2012) ................................................................................................ 6

*United States v. Aaron Troodler*,
   No. 16 Cr. 259 (CS), 2017 WL 7512198 (SDNY) (December 22, 2017) ............................... 25

*United States v. Block,*
   No. 16-cr-595 (S.D.N.Y) ............................................................................................ 23

*United States v. Booker*,
   543 U.S. 220 (2005) ......................................................................................... 5, 20, 22

*United States v. Brown*,
   514 F.3d 256 (2d Cir. 2008) ......................................................................................... 6

*United States v. Canova*,
   485 F.3d 674 (2d Cir. 2007) ......................................................................................... 6

*United States v. Christine Bodouva,*
   16 CR 214 (VEC) ...................................................................................................... 29

*United States v. Crosby*,
   397 F.3d 103 (2d Cir. 2005) ......................................................................................... 7

*United States v. Harkonen*,
   No. 08-cr-164 (N.D. Ca.), Dkt. 373 at 60:2-5, 154:2-160:3 .................................................. 25

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008) ....................................................................................... 25

*United States v. Jones*,
   531 F.3d 163 (2d Cir. 2008) ......................................................................................... 7

*United States v. Kelley*,
   No. 16-cr-00837 (S.D.N.Y.) ........................................................................................ 24

*United States v. Kevin C. Schuler, et al.,*
 Docket No. 16-CR-776 (VEC) ................................................................. 28, 29

*United States v. Lumiere,*
 No. 16-cr-483 (S.D.N.Y.) .......................................................................... 22

*United States v. Mullings,*
 131 F. Supp. 3d 1 (E.D. N.Y. 2015) ......................................................... 25

*United States v. Musgrave,*
 647 F. App'x 529 (6th Cir. 2016) .............................................................. 25

*United States v. Prosperi,*
 686 F.3d 32 (2012).................................................................................... 25

*United States v. Singh,*
 No. 16-1111-CR, 2017 WL 6327823 (2d Cir. Dec. 12, 2017) .................. 25

*United States v. Whyte,*
 Docket No. 1:08-cr-01330 (12/29/2008) ................................................... 28

*United States v. Williams,*
 524 F.3d 209 (2d Cir. 2008) ...................................................................... 6

**Statutes**

18 U.S.C. § 3553(a) ............................................................................. passim

**Other Authorities**

ABA Standard for Criminal Justice Sentencing 18-6.1 ................................ 6

*Court & Community: An Information Series About U.S. Probation & Pretrial Services,*
 U.S. Office of Probation & Pretrial Services, at 2 (2005) ........................ 26

*Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases,*
 125 Yale L.J. 1018 (2016) ........................................................................ 21

http://www.investmentnews.com/article/20171108/FREE/171109929/brian-block-sentenced-to-
 18-months-in-prison.................................................................................... 23

https://www.justice.gov/usao-sdny/pr/former-chief-financial-officeramerican-realty-capital-
 partners-sentenced-accounting.................................................................... 23

https://www.ussc.gov/research/research-reports/youthful-offenders-federal-system................. 15

https://www.ussc.gov/sites/default/files/pdf/research-andpublications/federal-sentencing-
 statistics/state-district-circuit/2017/2c17.pdf............................................. 22

https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf .................................................................. 24

*The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, at 6-9 (March 2017)*,
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf ................................................................. 26

USSC Section 2B1.1 (a)(1) .......................................................................................................... 14

We respectfully submit this Sentencing Memorandum on behalf of John Tyler Lambert, who is scheduled to be sentenced on November 18, 2019.

## I.      PRELIMINARY STATEMENT

It was a clear and beautiful day on April 16, 2019 in eastern Tennessee.  John Tyler Lambert was home with his family just starting his day.  John Tyler was a student at Northeast State College.  Without warning, his mother Connie was summoned to the door by persistent knocking, to be met by an Assistant U.S. Attorney and an investigator out of the Southern District of NY demanding to see John Tyler.  Connie directed these individuals to John Tyler, and he was then arrested.  At the time of his arrest, John Tyler was 23 years old.

John Tyler was shocked when confronted by these government officials and did not understand why he was being arrested or what charges had been filed against him.  It soon became clear that his arrest was based on conduct that began when John Tyler was 20 years old and, along with his partner at Campbell University in North Carolina, decided to start a business while in college offering web design services.  This business expanded to include a claim that the business also offered legal resources, which ultimately led John Tyler and his partner to create a fake law firm, complete with fictitious biographies of lawyers, claiming to be located in Manhattan and providing legal services to the public.  None of those claims were true.

John Tyler and his partner, claiming to be Eric Pope and Gregory Shapiro, fabricated their legal background as they had no legal training, had not gone to law school and did not possess the law licenses which they both represented to possess to attract customers.  This fake law firm was advertised on freelance web platforms such as Upwork (www.Upwork.com) and FiveRR (www.FiveRR.com).  His partner, who grew up in New Jersey but often claimed to be from Manhattan, suggested a fake New York law office was a better location from which to advertise.

1

The company performed fairly simple legal transactions and contract type work, however, neither party was licensed to practice law.

John Tyler was not indicted in this case but waived his right to have his case presented to a grand jury. This is because John Tyler has, from the outset of this case, acknowledged his guilt and approached the entire tragedy with a deep sense of remorse for his wrongful conduct. He has wanted to minimize as much as possible the burden on the Government and was willing to admit his wrongdoing in an effort to deal in a straightforward manner with this unfortunate situation. The same cannot be said for his "partner in crime," who took half of the money the parties obtained from their criminal conduct.

We understand that the Court must impose appropriate punishment.  We respectfully submit that consideration of the Section 3553(a) factors weighs heavily in favor of a non-custodial sentence which is below the advisory range calculated under the Plea Agreement pursuant to the U.S. Sentencing Guidelines (the "Guidelines").  The Guidelines calculation agreed to in the Plea Agreement in this case was 15-21 months. One key factor in determining an appropriate punishment, which may include a non-custodial sentence, is the need for the sentence to reflect the seriousness of the offense but also to provide just punishment. We believe a non-custodial sentence with mandatory conditions during supervised release meets that standard.

Another key factor to determine the appropriate punishment in this case is the history and characteristics of John Tyler. Apart from the serious mistake John Tyler made leading to the instant charges, John Tyler has spent his young life operating totally within the boundaries of the law and devoting his time to helping others. John Tyler has never been arrested or charged with any crime before this case. We provide four letters, attached in Exhibit A, that are submitted by family members and a close family friend that show a side of John Tyler that is powerful evidence of the

2

positive impact John Tyler has had on the people around him.  These letters do not describe a person who has led a ruthless life, the type of irredeemable person undeserving of a second chance. The letters describe how these individuals observed John Tyler growing up and how he used his personal time to the betterment of others and to pursue his education.

John Tyler asked people close to his family to write letters in support of his sentencing because most of his friends are, or had been, involved in the political sphere John Tyler joined when he began college at age 19.  As described in more detail below, John Tyler's arrest and the massive amount of press coverage attendant to his being a former co-founder of "Students for Trump," has caused significant consternation among his family and estranged him from his friends.

John Tyler is simply a person who, at his core, derives joy from helping others. He is the model example of a good young man who simply made a bad mistake.  In light of these factors and others described in this Memorandum, we respectfully ask your Honor to impose a non-custodial sentence, with mandatory conditions of supervised release that will benefit not only this young man but inform those who may attempt to follow in his footsteps of the significant punishment attendant to such crime.  We trust that the Court's fair assessment of all of the Section 3553(a) factors will lead to the decision of an appropriate and just sentence, which we respectfully submit should be supervised release with appropriate mandatory conditions (as describe herein) as punishment for the conduct of John Tyler.

John Tyler has already experienced ridicule and public derision far exceeding what most defendants are forced to endure for this type of crime.  Based on the fact that John Tyler was a co-founder of "Students for Trump," originally teaming up at Campbell University in North Carolina with the founder of the organization, Ryan Fournier, when he was only 20.  The public scrutiny

surrounding this case has been merciless. The amount of attention that this case has generated has been a nightmare for John Tyler and for his family as described in more detail herein.

The notoriety attendant to him and his partner's creation of a fake law firm, Pope and Shapiro, and his subsequent guilty plea and criminal conviction will be a punishment throughout his life. Moreover, John Tyler will spend a good portion of his life without the possibility of pursuing any significant career options that require governmental licensing. John Tyler will not be allowed to obtain any federal student loans to support his future educational goals, and will have his right to vote, possess firearms and other civil rights significantly curtailed. Despite those factors, John Tyler promptly acknowledged his actions, pled guilty and is now committed to turning his life around and becoming a productive citizen in this society once his sentence has been completed.

## II.  PERSONAL BACKGROUND

John Tyler has been an excellent student, active in school activities in both high school and college and an active participant in his local church activities.

### A.  Childhood and Family

John Tyler's biological parents are Michael and Connie Lambert. John Tyler's parents were divorced, and he and his mother thereafter moved to eastern Tennessee. In 2007, Connie was remarried to Matt McGaffee. John Tyler was also close with his grandparents, who lived nearby and were a fixture in his life while growing up. PSR ¶¶ 61-63, p. 11.

### B.  Education

John Tyler graduated from Liberty University High School, completing his studies online. Upon graduation, John Tyler was accepted in 2015 to Campbell University in North Carolina. He was 19 years old at the time.

In high school and when beginning college, John Tyler became active politically, joining the College Republicans and other groups. It was while he was at Campbell University in 2016 that he met and became involved with "Students for Trump" founder Ryan Fournier. John Tyler ultimately was appointed "co-founder," and helped in promoting the growth of the organization to over 300 college campuses. PSR ¶ 77, p. 13. Campbell University is a conservative school, and most of the students who were active politically in 2016 supported Ted Cruz or Marco Rubio. Supporting Donald Trump was not considered a mainstream conservative position in 2016.

## III.    THE OFFENSE CONDUCT AND APPLICABLE LAW

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the US Sentencing Guidelines are no longer mandatory but are merely advisory guidelines for the court to follow. This change was based on the Court's earlier decision in *Koon v. United States*, 518 U.S. 81, 113 (1996), stating "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Congress requires a judge to impose a sentence "sufficient, but not greater than necessary," to serve the purposes of punishment, as guided by the factors set forth in 18 U.S.C. § 3553(a). The notion of individualized punishment matches the judge's assessment of a defendant's offense to determine the appropriate punishment. *See* 18 U.S.C. § 3553(a). "The sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it." *Molina–Martinez v. United States,* 136 S.Ct. 1338 at 1346 (2016).

This guidance is supported by decisions in the Second Circuit, which have held that courts "may not presume that the Guidelines range is reasonable," but instead "must make an

individualized assessment based on the facts presented." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 49-50 (2007)); *see also, Pepper v. United States*, 131 S. Ct. 1229, 1232 (2012) where the Court held that "[c]onsistent with the principle that "the punishment should fit the offender and not merely the crime," *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. …, this Court has observed a consistent and uniform policy "under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law," *id.*, at 246, 69 S.Ct. 1079, particularly "the fullest information possible concerning the defendant's life and characteristics," *id.*, at 247, 69 S.Ct. 1079."

The American Bar Association's standards for criminal justice sentencing, which advise sentencing courts, also agree with the foregoing and state that the sentence imposed should be "the minimum sanction that is consistent with the gravity of the offense, the culpability of the offender, the offender's criminal history, and the personal characteristics of an individual offender that may be taken into account." The ABA Standard for Criminal Justice Sentencing 18-6.1. https://www.americanbar.org/groups/criminal_justice/publications/criminal_justice_section_arch ive/crimjust_standards_sentencing_blk/#6.1

The Second Circuit has held that a sentence can be deemed reasonable by looking not only at the actual sentence itself, but by the process that the court used to decide upon that sentence. *See United States v. Canova*, 485 F.3d 674, 679 (2d Cir. 2007). The appropriate yardstick is "whether the sentencing judge treated the Guidelines as advisory and whether she considered the Guidelines and all of the other factors listed in § 3553(a)" in imposing the sentence. *United States v. Brown*, 514 F.3d 256, 264 (2d Cir. 2008).

Since the United States Sentencing Guidelines are advisory, the district court has discretion in fashioning a sentence appropriate to the individual circumstances and the unique facts of the offense committed the defendant. While the Court will consider the guideline range in this case, it may vary from the guideline range "based solely on policy considerations, including disagreements with the Guidelines." *Gall v. United States*, 552 US 38; 128 S. Ct. 586, 597 (2007).

The Second Circuit has also held that in determining an appropriate sentence in the post-*Booker* regime, a sentencing court should consider the Guidelines as well as all of the factors listed in Section 3553(a). After considering the Guidelines and Section 3553(a) factors, the court can then decide "whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non- guidelines sentence." *See United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). Hence "the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence." *Id*.

"In short, while a sentencing court is statutorily obligated to give fair consideration to the Guidelines before imposing sentence . . . in the end, it must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones,* 531 F.3d 163, 170 (2d Cir. 2008). The Supreme Court has clearly signaled that district courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence. *Id.* at 172.

In light of the statutory requirements and considerations, we offer the following analysis of the impact of the relevant sentencing factors that the Court will be considering under 18 U.S.C. § 3553(a) when imposing a sentence on John Tyler.

### A.      Character and History of John Tyler Lambert

#### 1.      John Tyler's Personal History and Characteristics Support a Non-Custodial Sentence

John Tyler's characteristics shown in his young life support a non-custodial sentence.  The letters attached as Exhibit A, summarized below, detail this fact by demonstrating his completely law-abiding life with no history of any criminal involvement, that he has been a loving son and grandson who has been involved in various community service and church organizations and is deeply remorseful and ashamed of his conduct  This remorseful attitude demonstrates that there is no likelihood of John Tyler ever committing another criminal act in the future.   The following summary provides the highlights from the letters to this court in Exhibit A supporting John Tyler:

### Connie Lambert, John Tyler's Mom

The day John Tyler was born was the happiest day of my life.  God blessed me with a beautiful baby boy.  From that day we had a special bond.  John Tyler stayed home with me until he started Kindergarten.  I was blessed to be able to spend those special years seeing and enjoying all the new and exciting changes and milestones as he grew.

From the time John Tyler was 3 years old, I have always taught him to give back.  One of the things we did each year at Christmas was purchase and deliver gifts to underprivileged children.  Doing this made a lasting impact on him.  When he was 7 years old, the child we chose was a 5-year-old girl.  One of the things she asked for was bubble bath.  John Tyler asked why she wanted bubble bath for Christmas.  He was perplexed that she would ask for such a simple household item.  He was moved to tears when I explained that some children didn't have much and while it was a simple thing to him, it was a luxury to the little girl.

In college, one of John Tyler's friends was frequently ostracized for his race and sexual orientation.  This friend would accompany their social group to events which required financial

resources that he didn't have.  John Tyler not only went out of his way to make him feel welcome, he also called me to ask if he could take his money that I gave him for his expenses at school to make sure his friend was able to attend the event.

John Tyler is the type of young man who when a young female friend had too much to drink and was in a situation where she felt unsafe, she felt comfortable enough to call him and know he would come get her and take her to her parent's home.  Another friend in college had a nephew who was diagnosed with cancer.  It deeply affected John Tyler and he helped raise money for the boy's cancer treatment and a new playground for when he came home from the hospital.

John Tyler has done a lot of volunteer work over the years.  Since childhood, he has collected cans for the Holly Help fund which goes toward spaying and neutering cats and dogs. He has facilitated the collection of winter coats to be donated to children in need.  While in college, he was the National Advisor for Opioid Solutions.  Since his indictment, he has continued his volunteer work by distributing meals and food supplies for the elderly and their pets through the First Tennessee Human Resource Agency.  Being able to help these people in need has made a big impact on him.

Since his indictment, he has continued his volunteer work by distributing meals and food supplies for the elderly and their pets through the First Tennessee Human Resource Agency.  Being able to help these people in need has made a big impact on him.  While I know what John Tyler did was wrong, and I'm not excusing his actions, I do know through our many conversations that he is extremely sorry for what he did and wants to make restitution.  Please don't let his poor decision in this matter define who he is.  He is so much more than that.

**Matthew McGaffee, John Tyler's Father**

I have been a part of John Tyler's life since he was 10 years old. I have had the privilege of watching him grow from being a boy into being a young man. I don't have any biological children of my own. I do have a large close family with nieces and nephews, 3 brothers and 1 sister. John Tyler has always been a great young man showing characteristics of honesty, loyalty, and trustworthiness.

His mother and I have always strived to be the type of parents, role models and people of good character for him that this world needs from parents while it's in such a dark place. I've not always been perfect and maybe I failed at my job of being a father or at least that's how I feel. This has weighed so heavy on my heart trying to figure out where I went wrong in my role of being a father.  I do not condone or want to minimize any part of this or what he has done whatsoever.

John Tyler went to a private school with very few students his whole life therefore not having a lot of outside influences in his lifetime. I think that when he went off to college he met and started hanging out with the wrong people and not having the social skills most young men have at that age of being in a larger school with a lot of different kids this may have been a mistake on our part especially mine being the head of the house.

John Tyler has a long road ahead of him like I have told him with this black cloud hanging over his head that will follow him for the rest of his adult life and that he will have to explain to everyone when trying to get employment or even getting married if someone knows of his past. I am certain this poor choice will hang over him and not be with any ease.

I would like you to consider an alternative form of sentencing that could allow him to make an impact on other students of his age in the community. He is an example that bad decisions you make can affect your life forever because he is going to be living proof of that. I ask you to let him

10

stay in school and finish his degree, get a job to pay these people back their hard-earned money, do community service and be on a long and strict probation or whatever you see fit.

**Pat Barb, John Tyler's Grandmother**

John Tyler has always been very close to me throughout his life no matter his age. He has always spent a lot of time with me which I do not get from my other grandchildren.  John Tyler was very close to my husband, his papaw. As a young boy he was by his papaw's side learning to build and operate heavy equipment, always going out with him on his development sites. His papaw taught him to always shake people's hands when introducing himself. He started doing this when he was only 3 years old.

As John Tyler grew into his teenage years, he loved the outdoors. He would mow my lawn and help me in the garden. I could tell he enjoyed this opportunity to spend time with me and he took pride in the landscaping. John Tyler would never ask to run around with the other boys or get into trouble most common high school aged kids do. He wanted to be with his family and expressed this is where he had the most fun, sharing moments with us.

When John Tyler left for college, I missed him so much. He lived 5 hours away, but he would still come, unprovoked, and take me to church very often. He called and checked on me when my other grandchildren didn't take the time to. While I love all my grandkids, John Tyler has gone above and beyond the call of a grandchild countless times.

On April of 2019, the worst possible thing happened, and my daughter shared the news that he had been arrested. She was not informed why, all we knew is that he was being taken away and we were in shock. To this day I cannot get over seeing him go through that and the sheer distress and anxiety that rushed through my body. After his release he discussed with us what happened.  I strongly believe based on my deep connection and relationship with my grandson that

he got in the wrong crowd and with a person that, especially having just lost his papaw and being away from home, he could not pull away from. Even well-meaning friends can often lead you astray.

John Tyler has expressed to me how deeply sorry he is for all of this and reflected with me the young man he was and now who he wants to be moving forward. I know my grandson has asked God to forgive him for these actions. I feel in my heart incarceration is not something that would benefit him or the community.

### Andrea Wilde, Long-Time Family Friend and "Second Mom" to John Tyler

I have known John Tyler his entire life. His mother and I have been best friends for nearly 25 years, and John Tyler has referred to me as his second mom over the years. To say I was shocked to learn of the charges against John Tyler is an understatement. As the mother of two girls, John Tyler has always been the type of young man any mother would love to have a daughter date, and the type of son who never gave his mother any trouble.

John Tyler has always gone above and beyond the call of duty even at a very young age. I remember very well when he was in school at Academy at King, he would go out of his way to help in any way he could. He led the school's media tour when they opened the new campus and on recommendation by the principal, all new students shadowed him at the beginning of the school year.

I remember during the time John Tyler was involved with Students for Trump, his mother expressed concern to me that he seemed distant and she could tell something was "off." This was highly unusual and out of character for him. In hindsight, it's clear to me that his involvement with the wrong crowd had him doing things that contributed to his pulling away.

I have spent several hours talking with John Tyler since his indictment and he has fully accepted responsibly for his actions and expressed deep regret for his poor decisions that led to the charges against him.  He is sincerely remorseful, and I can't imagine a scenario where prison would be beneficial.  I would be remiss not to mention that I am worried how incarceration would affect not only John Tyler, but his mother, Connie. They have a very close relationship, and this whole ordeal has been devastating for her.

### B.       The Nature of the Offense

On August 6, 2019, John Tyler pled guilty to one count of conspiracy to commit wire fraud. *See* PSR ¶¶ 2 and 4.  John Tyler has accepted responsibility for his actions, fully and without hesitation or qualification.  As part of his acknowledgement of guilt, John Tyler waived Indictment and promptly pled guilty to the charges against him.

John Tyler has zero criminal history points.  *See* PSR ¶ 4.  John Tyler is subject to the Forfeiture Allegations and/or the Substitute Forfeiture Allegations as a result of offenses as alleged in Count 1 of the Information.  *See* PSR ¶¶ 3

## IV.     THE APPLICABLE SENTENCING GUIDELINES CALCULATION RANGE

The Guidelines are merely one factor to consider in determining an appropriate sentence. *See United States v. Gall*, 552 U.S. 38 (2007). Judges must consider all of the 18 U.S.C. § 3553(a) factors to make an "individualized assessment" of what sentence would be "sufficient, but not greater than necessary" to achieve the various purposes of the criminal justice system in a particular case. *Id*. at 49-50.  In other words, district courts "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*).

A.      **The Guidelines Calculation**

John Tyler has no prior criminal record, and thus is a Criminal History Category I conspiracy to commit wire fraud defendant, with a base offense level of 7 pursuant to USSC Section 2B1.1 (a)(1).  PSR ¶ 42, p. 9.  When he pled guilty, the Plea Agreement included the provision that John Tyler agreed to a restitution amount of $46,654.50, which added a six-level enhancement to his offense level, yielding an offense level of 14.  A two-level enhancement was added because the offense involved 10 or more victims and resulted in financial hardship to at least one person, and an additional two-level enhancement based on the government's position that the offense involved sophisticated means.  The government agreed to a three-level reduction credit for prompt acceptance of responsibility, resulting in a Guidelines range of 15-21 months.

In the PSR, the Probation Officer suggested a further enhancement of two-levels, based on his assessment that the crime included an abuse of public or private trust.  PSR ¶ 47, p. 10.  During his investigation, the Probation Officer interviewed one of the character witnesses provided by John Tyler, his mother Connie.  The PSR also summarized information about the charges that was previously provided by the government or obtained from a review of court-related documents. PSR ¶ 7, p. 5.

B.      **The Court Should Depart from the Sentencing Guidelines and Impose a Non-Custodial Sentence Based, in Part, on John Tyler's Status as a Youthful Offender**

We acknowledge that John Tyler's actions must be punished.  We submit, however, that given his age and immaturity the court should depart from the Guidelines and impose a non-custodial sentence, with supervised release and appropriate additional mandatory conditions during the period of his supervised release.

This position is supported, in part, by the report prepared by The US Sentencing Commission and published on May 26, 2017, which analyzed youthful offenders in the Federal

14

System (the "Report").  *See* https://www.ussc.gov/research/research-reports/youthful-offenders-federal-system.  This Report found that 18% of the federal offender population were youthful (defined by the USSC as age 25 or younger).  The majority (57.8%) of youthful offenders were Hispanic.  92% of offenses committed by youthful offenders were nonviolent.  No New York District Court appeared among the top five districts in sentencing youthful offenders as a proportion of cases or by the raw number of cases.  *Id.* pp.18-19.  Of the most common offense types committed by youthful offenders, drug trafficking (30.9%) followed by immigration (28.6%) were most common.  Only 5.4% of youthful offenses were for fraud.  *Id.* p. 21.  An important statistic also revealed that 98.5% of these youthful defendants pleaded guilty.  *Id.* p. 37.

In a relatively recent change, the Commission also recognized the role youth may have at sentencing.  Specifically, § 5H1.1 provides that age—including youth— "may be relevant in determining whether a departure from the Sentencing Guidelines is warranted, if considerations based on age, either individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. . .." *Id.* p. 4, *citing* Internal Footnote 18:

> *see* USSG §5H1.1 (Age (Policy Statement)). After the decision in *United States v. Booker*, 543 U.S. 220 (2005), under 18 U.S.C. § 3553(a), sentencing courts may also consider age in determining whether and to what extent a variance is warranted. *See United States v. Chase*, 560 F.3d 828, 830–31 (8th Cir. 2009) (After *Booker* "factors such as a defendant's age, medical condition, prior military service, family obligations, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure"); *see also United States v. Feemster*, 572 F.3d 455, 463–64 (8th Cir. 2009) (120-month sentence based in part on defendant's age (26 years) at time of the instant offense was substantively reasonable where district court determined that a downward variance from 360-month to life guidelines range was warranted); *but see United States v. Omole*, 523 F.3d 691, 698–700 (7th Cir. 2008) (defendant's 12-month sentence was substantively unreasonable where defendant's young age (20 years) and "lack of understanding that people of his age seem to reflect" were not a "compelling justification" for the substantially lenient sentence).

15

The Report also recognized that the sentence can be below the guideline range for other reasons initiated by the court. "Courts may take into account mitigating factors in the offender's personal history or instant offense, among other considerations, in deciding to reduce the sentence." *Id.* p. 38.

Until 2010, the guidelines had provided that age—including youth—was "not ordinarily relevant" in determining whether a departure from the guidelines was warranted. *Id.* p. 19. The Commission adopted this less restrictive departure standard "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." *Id.* p. 20.

The Youthful Offenders report studied in detail the impact of the relative immaturity in higher brain functioning as contributing to diminished risk avoidance and underdeveloped moral reasoning of youthful offenders. *Id.* p. 6. The Report evaluates psychological and medical research focusing on the medical aspects of the prefrontal cortex of the brain, which is the last part of the brain to fully develop and which develops irrespective of the nurturing upbringing that an offender may encounter. As described in the PSR, John Tyler led a somewhat sheltered life, went to private schools and lived at home during his life up to college. PSR ¶¶ 61-63, p. 11.

The contribution that neuroscience has made to the study of youthful offending is significant and continues to evolve. That research has focused on the prefrontal cortex of the brain, which is located at the front of the frontal lobe and is the last part of the brain to fully develop. The prefrontal cortex is utilized in impulse control, emotional reactions, executive function and decision making. Development of the prefrontal cortex involves both biology and sociocultural experiences. Focusing on the biological development of the brain, numerous studies using Magnetic Resonance Imaging (MRI) of the brain show that the brain goes through two major

processes during adolescence and into young adulthood: (1) synaptic pruning, which involves the strengthening of important or often-used neural connections, and the discarding of infrequently used synapses; and (2) the myelination of the frontal lobe, which refers to the addition of the myelin sheath to the axiom of neurons that allows for faster and more complex brain functions. Neuroscientists refer to the former process as the whitening of brain matter; pruning reduces gray brain matter. People at different stages of these processes have different brain structures and functions compared to people who have fully developed brains. *Id.* p. 30.

The report further noted the landmark studies in brain development are a 2005 meta-analysis of all studies completed through 2004 on frontal lobe development and maturation. The authors established a model of frontal lobe development to suggest that maturation is completed in the mid-20s. Another study compared frontal lobe contributions to cognitive control in children and adults. The results indicated clear differences in the ways and extent to which the frontal lobe was used in decision making. *Id.* p. 32.

In light of the science discussed above, the report notes "there has been significant debate among policymakers regarding the age at which a person should be held responsible for their actions because of different stages of brain development and this debate has also played out in scientific literature. However, there are a number of points on which researchers in this area generally agree. First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place but note there will be significant variation from person to person." *Id.* p. 36.

17

### C.     A Non-Custodial Sentence Achieves the Sentencing Goal of Both Specific and General Deterrence

In the instant case, it is significant that John Tyler was in his very early 20's when the illegal conduct occurred.  John Tyler's youth created a non-reality-based perception of "practicing law," which was fueled by TV shows such as "Suits." PSR ¶ 40, p. 9.  Shows such as "Suits" led John Tyler to believe he could "practice" at being a lawyer by performing tasks that he believed would be beneficial to his customers without significant risk, just as the character "Mike Ross" in "Suits" practiced law without a law degree or license and kept that secret without penalty.  John Tyler's experiences playing online community gaming with others, requiring the assumption of various personas, carried over into his development of an attorney persona.  John Tyler's youthful exuberance led him to believe that he could create a fake persona and act like a TV character, all with the goal of trying to learn the law and help others, without comprehending the consequences of his actions. John Tyler now fully acknowledges and appreciates the consequences of his actions.

### V.     CONSIDERATION OF THE 3653(A) FACTORS INDICATES THAT A NON-CUSTODIAL SENTENCE INCLUDING SUPERVISED RELEASE, COMMUNITY SERVICE INCLUDING SPEAKING ENGAGEMENTS TO HIGH SCHOOL AND COLLEGE AGE STUDENTS IS APPROPRIATE

### A.     John Tyler's History and the Characteristics and Nature of the Offense Support a Non-Custodial Sentence

John Tyler has no history of any criminal conduct in his young life.  His offense was fueled by his youthful energy in thinking he was helping people and learning about the law, while knowing full well that his actions in creating a fake law firm and spoofing customers was illegal. John Tyler and his partner used web sites such as www.Upwork.com and www.FiveRR.com as their source of advertising.  It is well known that such web sites do not vouch for their advertisers, nor represent that any of their site users actually are qualified to perform any of the services they

18

offer.  That is the platform John Tyler used with his partner to advertise their business, one in which buyers clearly understood they must beware of entities they retained.

After creating a fake law firm allegedly located in Manhattan, spoofing the phone number by purchasing an app online for $2.99, creating a web site address and name for $30.00 and maintaining that web site at a cost of $40 for the year, the "company" began offering "legal" services to unsuspecting consumers.  John Tyler never appeared in court, filed legal pleadings or conducted himself before any tribunal representing himself as an attorney, but acknowledges he represented himself as an attorney, which he was not.  After starting up this web business, it became clear to John Tyler that his actions were illegal.  When he finally came to grip with that fact, he shut down all solicitations for legal services after six months of activity.

John Tyler's action in terminating the illegal conduct voluntarily does not exonerate John Tyler; far from it.  But John Tyler quickly exhibited a full recognition that his actions were illegal and must be terminated.  He stopped the illegal activity and shut down all solicitations for work on the web sites, which actions occurred nearly one and a half years *prior* to his arrest.  This case is far different from the cases typically pursued by the SDNY US Attorney's Office.  Cases are often brought by the US Attorney for on-going illegal conduct with the focus on stopping such conduct and eliminating future harm to individuals or companies.  In this instance, however, the case was brought based purely on past actions, which ceased over one and a half years prior to John Tyler's arrest (we recognize that is within the prerogative of the US Attorney's Office).

It also must be pointed out that while the restitution amount was agreed to, based upon the payments to the company's PayPal account, John Tyler himself did not benefit to the full amount of that income.  It is important to note that all of the income obtained by the company for "services rendered" were split 50/50 with his partner in their endeavor.  The money that was received went

50% to his partner, "Benjamin Shapiro." While John Tyler recognizes his legal liability for the full amount of the restitution attributable to his participation in the scheme, it is important to note that his personal monetary benefit was far less than the amount received in total.

**B.    A Non-Custodial Sentence is Appropriate for the Offense and is Consistent With Similar Results in Other Cases**

Section 3553(a) requires this Court to consider a number of factors to "tailor" a sentence that reflects the particular circumstances of the case. *United States v. Booker*, 543 U.S. 220, 245 (2005). These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

b. to afford adequate deterrence to criminal conduct;

c. to protect the public from further crimes of the defendant; and

d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the Guidelines calculation;

(5) any pertinent policy statement by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among similar defendants; and

(7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a).

Regardless of the ultimate guideline range determined by the Court, it can, and respectfully should, determine that a downward departure from that range is appropriate, based on the factors set forth in 3553(a). John Tyler should be sentenced to supervised release, with a significant community service component, including a requirement to prepare and make presentations to college students and others about the perils and lifetime impacts of violating the law by wire fraud and other such schemes. Particularly given his position as a former co-founder of Students for Trump, he will be in a unique position to deliver this message to students and others about the severe consequences attendant to performing such illegal acts.

John Tyler is also well-suited to prepare such presentations as he has significant experience in public speaking and can speak eloquently about the dangers of thinking one can break the law without consequence. John Tyler will be a shining example for people, particularly for Trump supporters, who may believe that a person will be able to get away with illegal conduct by constantly denying the conduct was ever undertaken, never admitting to any wrongdoing and always misdirecting accusations against them by deflecting to others. John Tyler will demonstrate in his presentations that he is the antithesis of the typical Trump response to any criticism where he never, ever takes responsibility for his actions. John Tyler will acknowledge his guilt, demonstrate how he stepped up to take responsibility when confronted with his crime, how he promptly pled guilty and stood ready to accept his punishment, whatever this court decides.

### 1.   A Non-Incarceration Sentence Would be Consistent with the Evolving Treatment of Wire Fraud Cases in this Circuit

*Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L.J. 1018, 1052-53 (2016) was written by Jillian Hewitt. The study focused on fraud cases in the Southern District of New York. The report revealed that "[i]n recent years, roughly seventy percent of defendants in major white-collar cases received a downward departure from their Guidelines-

calculated sentencing range, and those departures were, for the most part, quite large." The report cites the fact that "judges in S.D.N.Y. have not shied away from using the discretion afforded by *Booker* to impose sentences significantly shorter than those produced by the Guidelines." *Id.* Indeed, "when a below-range sentence is imposed, it is generally vastly shorter than the sentence recommended by the Guidelines and the calculated sentences that are the result of performing an analysis of the Guidelines are rarely actually imposed, at least in S.D.N.Y." *Id.*

Those findings appear to be consistent with the most recent statistics provided by the U.S. Sentencing Commission, which show that in 2017 courts in the Second Circuit imposed a below-Guidelines sentence for 70.7% of all fraud defendants. See Federal Sentencing Statistics (2017), Tbl. 10, available at https://www.ussc.gov/sites/default/files/pdf/research-andpublications/federal-sentencing-statistics/state-district-circuit/2017/2c17.pdf (hereinafter, "Federal Statistics"). Of these below-Guidelines sentences, nearly 60% were not government-sponsored. *Id.*

Courts have imposed significantly below-Guidelines sentences in various circumstances, based on the specific nature of the case before the court. We would argue that such sentences were reduced for less compelling reasons than those in the John Tyler matter. Indeed, some sentences imposed below the Guidelines range apply to defendants who committed fraudulent conduct that was either far more extensive or involved much greater sophistication than the conduct of John Tyler. The following cases provide an example of such situations:

- *United States v. Lumiere*, No. 16-cr-483 (S.D.N.Y.); a former portfolio manager at Visium Capital Management was convicted after trial of wire fraud for orchestrating a complex scheme to overvalue securities to inflate the value of the fund. *Gov't Sentencing Mem.,* No. 16-cr-483, Dkt. 98 at 1-2. The Government argued that the wire fraud **caused a $9.5 to $25 million in loss to investors**, Id. at 3 (emphasis added). The wire fraud committed in that case resulted in millions of dollars in unlawful gain. *Sentencing Tr., June 14, 2017, Dkt. 117 at 2*. Judge Rakoff varied from the Guidelines range of 87 to 108

months even though the defendant played a "highly significant" part for months and his "attempt at blackmail" to conceal his crimes, imposing after trial a sentence of 18 months of imprisonment, *id.* at 29;

- *United States v. Block,* No. 16-cr-595 (S.D.N.Y); the former CFO of a publicly traded real estate investment trust was convicted of being the mastermind of a fraud to manipulate the company's financial results by fraudulently inflating a key metric used by investors. Former Chief Financial Officer of American Realty Capital Partners Sentenced For Accounting Fraud, Dep't of Justice Press Release (Nov. 8, 2017), https://www.justice.gov/usao-sdny/pr/former-chief-financial-officeramerican-realty-capital-partners-sentenced-accounting. The **Court accepted the Government's calculation of roughly $300 million in shareholder loss** (emphasis added) and stated that the defendant had "brazenly" falsified key accounting numbers but rejected the Government's proposed sentence of at least seven years' imprisonment. Brian Block Sentenced To 18 Months In Prison, Investment News (Nov. 8, 2017), http://www.investmentnews.com/article/20171108/FREE/171109929/brian-block-sentenced-to-18-months-in-prison. Noting, among other things, the defendant's clean criminal record prior to the offense and his "personal history" as a good father and friend, the court imposed a sentence of 18 months' imprisonment, *Id.*

The foregoing cases represent significant downward departures from the Guidelines range where there was a very substantial wire fraud loss amount.  In the case of John Tyler, his conduct was far less egregious, his conspiracy to commit wire fraud resulted in the loss of tens of thousands of dollars, not millions or hundreds of millions of dollars as cited in the above-referenced cases which still resulted in significant downward departures from the Sentencing Guidelines calculation.

### 2.    A Sentence of Supervised Release Would be in Line with Sentences Imposed upon Similarly Situated Defendants

John Tyler has learned his lesson and he has already paid a hefty price for his conduct, which we believe supports our position that incarceration is counter-productive.  In determining whether such result is appropriate, we recognize that the Court needs to consider and avoid sentencing disparities. A non-custodial sentence is in line with sentences imposed by judges for conduct similar or worse than that to which John Tyler has pled guilty.

The Second Circuit's sentencing statistics reveal that a substantial percentage of fraud defendants—15.9%—received non-custodial sentences. *See* Federal Statistics at Tbl. 5. The Sentencing Commission has acknowledged that fraud defendants are often well-suited to receive probation: "[o]ffenders convicted of fraud and other white-collar offenses, while still primarily sentenced to prison, also more often are sentenced to alternatives; approximately one-third of fraud and white-collar offenders are sentenced to prison alternatives." U.S. Sentencing Comm'n, Alternative Sentencing in the Federal Criminal Justice System (Jan. 2009), https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf

Courts frequently impose non-custodial sentences for defendants in fraud cases similar to this one, particularly where the defendant has accepted responsibility and pled guilty. In *United States v. Kelley*, No. 16-cr-00837 (S.D.N.Y.), Judge Oetken sentenced the defendant—who, unlike John Tyler, was facing a Guidelines-calculated sentence of 97-121 months—to just six months of home confinement, 1,000 hours of community service, and three years of probation. *Sentencing Tr.,* Sept. 29, 2017, Dkt. 44 at 7:6, 29:3-17.   Kelley had conspired to bribe a New York pension fund official, which earned her $200,000 in commissions from the ill-gotten business. She also concealed the scheme by agreeing to testify falsely in an SEC investigation about the bribes. Nonetheless, the court credited Kelley for ultimately confessing her wrongdoing and pleading guilty.  The defendant in *Kelley*, unlike John Tyler, was a highly trained woman who was in her fifties when she engaged in the criminal conduct at issue. But even there, where the court was not dealing with the misjudgments of a 20-year old like John Tyler, the court appropriately recognized that acceptance of responsibility should be a powerful factor in consideration of a non-custodial sentence for a non-violent white-collar defendant.

In *United States v. Harkonen*, No. 08-cr-164 (N.D. Ca.), Dkt. 373 at 60:2-5, 154:2-160:3, the court imposed a sentence of three years' probation, with six months of home confinement and 200 hours of community service, and a $20,000 fine, where the defendant was convicted by jury of wire fraud for misrepresenting the results of a drug trial, and Government argued there was over $20 million in losses and over 250 vulnerable victims, *citing footnote 4:*

> *See also, Prosperi*, 686 F.3d at 32, 34 (2012); *United States v. Howe*, 543 F.3d 128, 130-33 (3d Cir. 2008) (affirming non-Guidelines, non-custodial sentence based in part on crime being an "isolated mistake," even though defendant "engaged in a sustained effort to obstruct the investigation in order to hide his crime"); *United States v. Musgrave*, 647 F. App'x 529, 532-37 (6th Cir. 2016) (noting that defendant earned no profit from his crimes and that his criminal conduct included only one transaction, which were "appropriate mitigations"); *United States v. Mullings*, 131 F. Supp. 3d 1, 4 (finding a custodial sentence unnecessary where defendant's conduct "appeared to be an 'aberration' from his otherwise law-abiding life").

### C.   A Sentence of Supervised Release is Sufficient to Promote Respect for the Law and Meet the Goal of Adequate Deterrence and Protection of the Public

A previous defendant before this court in *United States v. Aaron Troodler*, No. 16 Cr. 259, 2017 WL 7512198 (SDNY) (December 22, 2017), argued in his Sentencing Memorandum to your Honor that leniency was appropriate and that a sentence of supervised release with other conditions was reasonable.  Defendant Troodler cited applicable caselaw and the language of the Second Circuit which stated that "[w]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind'" and in "deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'" *citing United States v. Singh*, No. 16-1111-CR, 2017 WL 6327823, at *10 (2d Cir. Dec. 12, 2017) (*citations omitted*).   John Tyler echoes the sentiments espoused by Aaron Troodler in his Sentencing Memorandum and hopes this court will exhibit such compassion in sentencing him.

No custodial sentence is necessary to promote specific deterrence in this instance. It is clear by the fact that John Tyler promptly accepted responsibility for his actions, pled guilty and cooperated with the Probation Officer that he will not re-offend. Indeed, there is research showing that first-time offenders like John Tyler are far less likely to commit another crime than other defendants. *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, at 6-9 (March 2017),* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf. In addition, the *Youthful Offenders Report* by the USSC found that the most common offenses for which youthful offenders were re-arrested were assault (26.7%) and drug trafficking (13.2%). *Infra,* at p. 49. These findings support our position that John Tyler's likelihood for recidivism on any criminal offense is extremely unlikely.

The Office of Probation and Pretrial Services recommends that in determining whether to impose a non-custodial sentence, courts "look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence." *Court & Community: An Information Series About U.S. Probation & Pretrial Services,* U.S. Office of Probation & Pretrial Services, at 2 (2005). John Tyler's close-knit family, longstanding connection to his community, and his genuine desire to help others by performing speaking engagements to provide direction to others to avoid making the same mistake he made, makes John Tyler the perfect candidate for supervised release, community service and speaking engagements in lieu of incarceration.

The ultimate question is whether a non-custodial sentence can also address the need for general deterrence. In this instance, the answer is a resounding "yes." The offense conducted by John Tyler occurred in one specific time in his young life while he was away from home, first in college and 20 years old and actively involved with the "Students for Trump" organization. The

26

severe personal and public penalty John Tyler is enduring, along with the intense media ridicule that has accompanied this case, is sufficient to deter college age students (and others) from engaging in conduct that that could subject them to the penalty John Tyler will receive.

When initial reports of John Tyler's arrest were first released, the web and others jumped on the matter solely based on John Tyler's involvement with "Students for Trump."  "The Young Turks" You Tube video gleefully castigated John Tyler, referring to his actions as the type of actions Trump and his followers often committed, concluding with a statement that the commentator hopes the judge "pounds him into the ground."  Further "comments" included the statement that "when he goes to jail where he belongs, I hope he's still allowed to vote." *See* *https://www.youtube.com/watch?v=KRTxPqZ_aXc*.

Myriad other outlets picked up the initial arrest story and all highlighted the fact that John Tyler was co-founder of Students for Trump and that his conduct demonstrated his disregard for the law because he was a Trump supporter.  *See, e.g. https://boingboing.net/2019/04/25/man-23-charged-with-posing-a.html*. Media coverage and derision continued thereafter and through John Tyler's plea agreement.  *Politico* published a 9-page online story about John Tyler's support of Trump in the 2016 campaign, citing numerous statements of John Tyler from his appearances on various TV networks and other media interviews.  The *Politico* article, however, generally focused only on the perils of being a Trump supporter.  Not until more than half way through the article does *Politico* actually discuss the crime committed here.  *See* https://www.politico.com/magazine/story/2019/05/09/trump-john-lambert-students-lawsuit-jail-226802. This *Politico* article was picked up by numerous other online outlets focused almost exclusively on John Tyler's prior connection to Students for Trump (it must be noted that John Tyler cut all connections with that organization shortly after the 2016 election).  Coverage also

included an article in the *NY Post*, based primarily on John Tyler's connection to Students for Trump, entitled "'Students for Trump' co-founder pleads guilty to wire fraud in Manhattan." *See* https://nypost.com/2019/08/06/students-for-trump-co-founder-pleads-guilty-to-wire-fraud-in-manhattan/.

The purpose of citing the foregoing is to highlight the "Trump effect" being attached to this case. Whatever sentence is imposed, John Tyler's already widely-publicized crime will ensure general deterrence will exist due to the extensive publicity generated by the case due to John Tyler's link to "Students for Trump." General deterrence occurs even when a person receives a sentence of non-incarceration – it shows that people do not get away with such illegal conduct. Young persons who may have seen this publicity already appreciate the fact that severe punishment can occur for such illegal conduct. While we may never be able to convince the "Trumpers" that a guilty plea and acceptance of punishment is an honorable approach to dealing with your actions, it will surely send the signal that a sentence of supervised release still punishes even a former Student for Trump co-founder. The sentence imposed will deter the general public from committing such illegal actions, even if this Court imposes a sentence of supervised release.

Other defendants before Your Honor have also made similar arguments, many without success. In conducting research on criminal fraud cases before this Court, we discovered that there were in excess of 35 cases before this court dealing with varying types of criminal fraud, from bank fraud to wire fraud to conspiracies (as here). In sentencing decisions from *United States v. Whyte,* Docket No. 1:08-cr-01330 (December 29, 2008) through the Buffalo Billions case involving Kevin C. Schuler in *United States v. Kevin C. Schuler, et al.,* Docket No. 16-cr-776 (VEC), this court has faced a myriad of difficult decision in assessing appropriate sentencing based

on the wide range of fraud cases and the disparate nature of the defendants encountered and the nature of the crime committed.

It is interesting to note that in the *Schuler* case, the court found, based "on all of my considerations, of all of the sentencing factors, and taking into account Mr. Schuler's substantial assistance to the government, I find that the guideline sentence is longer than necessary to achieve the goals of sentencing. I sentence you to time served, to be followed by a period of supervised release of two years, and a fine of $5,000." *See* Transcript of Sentencing, Case 16:CR:776 (VEC), Document 995, filed April 12, 2019, page 27.  This court further concluded that "[a]t least a third of that time should be spent talking to college students, or business groups, or law students about business ethics and the risks of failing to adhere to principles of integrity and honesty when dealing with the government. I entirely agree with Mr. Connors that if there is anybody who can talk to people and show them the risks of doing what you did, it's you. So, I think that's a better use of your time than spending time in jail or spending time in a soup kitchen." *Id.* at page 28.  John Tyler's sentence should be similarly crafted in the form of supervised release with the requirement that he also spend a significant portion of his time talking to appropriate groups about the risks of failing to adhere to the law and conducting oneself honestly.

In another criminal fraud case before your Honor, this court dealt with a situation where a defendant was charged with wire fraud related to her criminal prosecution by the US Department of Labor for embezzling money from her company's 401(k) fund for the third time.  *United States v. Christine Bodouva,* 16 cr 214 (VEC).  In the sentencing transcript for that case, this court evaluated the 3553(a) factors and the impact that the felony conviction would have on the defendant's life.  While the court felt obligated to impose a sentence of one year and one day, that decision was based on the defendant's continued lack of contrition and the three chances she had

been given to correct her behavior.  This court also noted in its sentencing hearing that "[in] the Southern District of New York, to get a theft case that involves roughly $125,000 is, in the Southern District, unusual because that money is not that large."  *See* Transcript of Sentencing, Case 1:16-cr-00214-VEC, Document 95, filed 11/22/16, page 34.

Here, John Tyler had no hesitation in accepting responsibility and pleading guilty to the conspiracy to commit wire fraud charge.  John Tyler has not been given a second or third chance at this point, compared to the chances given defendant Christine Bodouva.  John Tyler has shown his contrition without hesitation, he is willing to accept his punishment, but he was involved, at least from the Southern District's prospective, in a case that involves a very small amount of money from the Southern District's usual standards.  Thus, we ask this Court to impose the non-custodial sentence recommended by United States Probation Officer, Michael Melaika.

## VI.    CONCLUSION

For all of the foregoing reasons, the Court should impose a non-custodial sentence, with a three year period of supervised release, including a special condition of six months' home confinement, with community service obligations including a requirement for time spent speaking with high school or college students, community service organizations, business groups or business and law students about the risks of failing to adhere to the law and conducting oneself honestly.  Accordingly, we ask that this Court impose the non-custodial sentence recommended by USPO Melaika and the Presentence Report.

Respectfully Submitted,
HOWARD & HOWARD ATTORNEYS PLLC

By:/s/  *Gary A. Peters*
Gary A. Peters (P43594)
450 West Fourth Street
Royal Oak, MI 48067-2557
(248) 723-0490
Dated: November 4, 2019                    gpeters@howardandhoward.com

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2019, I electronically filed this *SENTENCING MEMORANDUM OF JOHN TYLER LAMBERT* with the Clerk of the Court using the ECF system, which will send notification of such filing to those registered persons/members of the Court's ECF system who are participants in these proceedings via electronic notice of this filing.


 */s/ Gary A. Peters*
Gary A. Peters (P43594)
450 West Fourth Street
Royal Oak, MI 48067-2557
 (248) 723-0490
gpeters@howardandhoward.com

Dated:  November 4, 2019

4818-0013-6601, v. 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOHN TYLER LAMBERT,

Defendant.

No.  1:19-cr-00571 (VEC)

---

# EXHIBIT A

# Letters from Family and Friends

October 14, 2019

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: John Lambert

Dear Honorable Judge Caproni,

As John Tyler's mother, I want to thank you for the opportunity to write this letter to provide some insight into our family and the type of young man he is.

I waited 29 years before becoming a mother and couldn't wait for the moment. The day John Tyler was born was the happiest day of my life. God blessed me with a beautiful baby boy. From that day we had a special bond. My joy was and has always been being his mother. He was the best baby. When people came to our home, they never knew he was there. He was always so well behaved. John Tyler stayed home with me until he started Kindergarten. I was blessed to be able to spend those special years seeing and enjoying all the new and exciting changes and milestones as he grew. When he started private school, I knew I wanted to continue to share in the growth and changes he would make. Again, I was very blessed to have the honor of being head homeroom mom through middle school. This allowed me to help with special projects, field trips and class parties with John Tyler and his classmates.

I was always so proud of my son and all the compliments I received from teachers and parents on how he was so respectful, kindhearted and helpful to them and their children. He has always loved helping people, even from a young age when he could barely carry things. He wanted to

be the big boy carrying things into the classroom or even when we got groceries. He was always my little helper. The parents at his school would tell their children if anything happened at school to sit beside John Tyler because I always overpacked his lunch with snacks and he always loved sharing his stuff with fellow classmates.

From the time John Tyler was 3 years old, I have always taught him to give back.  One of the things we did each year at Christmas was purchase and deliver gifts to underprivileged children.  Doing this made a lasting impact on him.  When he was 7 years old, the child we chose was a 5-year-old girl.  One of the things she asked for was bubble bath.  John Tyler asked why she wanted bubble bath for Christmas.  He was perplexed that she would ask for such a simple household item.  He was moved to tears when I explained that some children didn't have much and while it was a simple thing to him, it was a luxury to the little girl.  When we went to deliver the gifts, the floor was scattered with coal dust from the fireplace, and the little girl's bare feet were covered with soot.  On the way home, John Tyler was quiet and looked very sad.  I asked him what was wrong.  He wanted to know if we could take her bubble bath every Christmas.  He never forgot about the little girl and we took her bubble bath for the next several years.  He has always been a very loving, giving, and kind child.

In middle school he was a book buddy and loved reading to the younger children.  His generosity, kind heart and loving ways didn't stop at a young age, it has continued throughout his life.

In college, one of John Tyler's friends was frequently ostracized for his race and sexual orientation.  This friend would accompany their social group to events which required financial resources that he didn't have.  John Tyler not only went out of his way to make him feel welcome, he also called me to ask if he could take his money that I gave him for his expenses at school to make sure his friend was able to attend the event.

He has also offered time and services to help friends who didn't have transportation by driving them to places they needed to go and assisting in times of need such as helping when a friend had car trouble by installing his battery.

He is the type of young man who when a young female friend had too much to drink and was in a situation where she felt unsafe, she felt comfortable enough to call him and know he would come get her and take her to her parent's home.

Another friend in college had a nephew who was diagnosed with cancer. It deeply affected John Tyler and he helped raise money for the boy's cancer treatment and a new playground for when he came home from hospital.

I raised John Tyler to be a good and Christian young man. We attended church regularly when he was growing up. His faith is strong, and he knows God is just and forgiving.

A friend in college had gone through childhood trauma that made him question his belief in God. He felt tarnished and unworthy of God's love and struggled to understand a God who would allow terrible things to happen. John Tyler took the time to discuss his Christian faith with the friend, who in turn started reading Christian books and attending church. They had many follow-up conversations that opened the friend up to the concept of a loving Christian God.

John Tyler has done a lot of volunteer work over the years. Since childhood, he has collected cans for the Holly Help fund which goes toward spaying and neutering cats and dogs. He has facilitated the collection of winter coats to be donated to children in need. While in college, he was the National Advisor for Opioid Solutions. Since his indictment, he has continued his volunteer work by distributing meals and food supplies for the elderly and their pets through the First Tennessee Human Resource Agency. Being able to help these people in need has made a big impact on him.

I pray that you will be able to see the good in him and see that the things he has done regarding this case are out of character for him. He has never caused me an ounce of problems in his life. He is a young man that doesn't drink or use drugs. Even in college, he would call and let me know if he was going out, who he was with and where he was going. I am very blessed to have kept a close and open relationship with my son through all his years of growing up. We have always referred to ourselves as peas and carrots.

To say I was in shock and disbelief the morning the federal agents with the U.S. Attorneys Office and police officers showed up at my door is an understatement. It was one of the most traumatic events of my entire life. Writing about and reliving this experience is extremely

difficult. Please bear with me while I try to describe the nightmare this has been ever since. When I opened the door and they asked, "Where's John" I froze in disbelief. I couldn't process what was going on. In an unnecessary show of force, they shoved their way through the door, pushing past me and proceeded to tell my son he was under arrest and handcuffed my son without answering my pleas as to what was going on. The complete helplessness I felt in not being able to protect my son was something I have never experienced as a mother. I am traumatized by that memory every single day. I have suffered from symptoms of PTSD and can't walk in my kitchen or hear a siren without being overtaken with extreme anxiety. I live in fear that someone is going to knock on my door and take my son again.

John Tyler realizes that he made this very poor decision and he is very remorseful for his actions. We have had many conversations since his arrest. He told me that he had already ceased his role in this almost 1 ½ years prior to his arrest.

With the information I have now, I understand why he didn't seem himself; I knew something was terribly wrong. It affected his school, his personal life, and his self-esteem. The John Tyler that I sent to college was not the same person who came back to me. He was withdrawn, morose and showed signs of depression. My son with the cheerful disposition, who was very involved with family was nowhere to be found. He had checked out.

He sought counseling during that time, and while I don't know what was going on through those sessions, he expressed issues with a lack of self-worth. He has done much self-reflection and realizes that he was lost and felt the spiritual weight of his actions.

John Tyler is in school and plans to pursue his interest in business and real estate development. Attending university and receiving formal education has always been important to him. While his academic performance suffered during this ordeal, he has improved and regained focus, and I feel incarceration would impede the progress he's made.

While I know what John Tyler did was wrong, and I'm not excusing his actions, I do know through our many conversations that he is extremely sorry for what he did and wants to make restitution. Please don't let his poor decisions in this matter define who he is. He is so much more than that. I implore you to consider that he is a loving, caring, giving young man with deeply felt emotions who will live with the consequences of his actions for the rest of his life. I

am pleading for your mercy for my son. Please consider alternative sentencing measures that will not make John Tyler go to prison. The thought of him in prison is something I cannot begin to process. I don't feel locking him up would be the most beneficial form of punishment, and in fact may be detrimental to his rehabilitation. You would be depriving society of his future positive contributions. He is a good boy who made some poor decisions. I know the good my son is capable of if given the opportunity to give back by helping other young people not make the same mistake and through volunteering to help the needy. Our world is in dire need of prayers and help. I pray you will see this in him.

Thank you again for this opportunity to provide you with some insight into who my son is.


Sincerely,

Connie Lambert

October 11, 2019

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: John Lambert

Dear Honorable Judge Valerie E. Caproni,

My name is Matthew McGaffee and I'm John Tyler's father. I wanted to write you and tell you a little bit about me and about John Tyler. I have been a part of John Tyler's life since he was 10 years old. I have had the privilege of watching him grow from being a little boy into being a young man. I don't have any *biological* children of my own. I do have a large close family with nieces and nephews, 3 brothers and 1 sister. John Tyler has always been a great young man showing characteristics of honesty, loyalty, and trustworthiness. He is someone who anyone could be proud of to call him their son, friend, grandson, nephew or cousin.

His mother and I have always strived to be the type of parents, role models and people of good character for him that this world needs from parents while it's in such a dark place. I've not always been perfect and maybe I failed at my job of being a father or at least that's how I feel. This has weighed so heavy on my heart trying to figure out where I went wrong in my role of being a father. The John Tyler that I have known and loved like my own son has always been a compassionate, caring, loving, thoughtful and respectable young man his entire life. To say I was in total disbelief the morning his mother called me crying and could barely talk when she told me this had happened would be nothing short of the absolute truth.

I do not condone or want to minimize any part of this or what he has done whatsoever. I think that as boys we grow up wanting to be successful and to make our parents proud, our mothers especially and be a man who stands on his own two feet. During these steps we take in life growing up we make decisions not always the right ones and, in this case, I think that's exactly what happened. John Tyler went to a private school with very few students his whole life therefore not having a lot of outside influences in his lifetime. I think that when he went off to college he met and started hanging out with the wrong people and not having the social skills most young men have at that age of being in a larger school with a lot of different kids this may have been a mistake on our part especially mine being the head of the house. This was detrimental to his decision-making skills and certainly contributed to him making the wrong choices which led to a horrible mistake.

John Tyler has never been someone to get in trouble or drink or do drugs or even wreck a car as I did as a young man being careless and misguided. He has always been cautious and thinks before he does things except in this case. John Tyler is in school making good grades, he volunteers for the community and he attends church. He has a long road ahead of him like I have told him with this black cloud hanging over his head that will follow him for the rest of his adult life and that he will have to explain to everyone when trying to get employment or even getting married if someone knows of his past. I am certain this poor choice will hang over him and not be with any ease.

I am asking for you to please see a young man standing before you who is a good person and has a good heart that just made a horrible mistake and understands he made a horrible mistake not to be over looked. I ask that you give my son mercy based on the life he has led outside of this poor decision. I fail to see that prison will do him any good and I would like you to consider an alternative form of sentencing that could allow him to make an impact on other students of his age in the community. He is an example that bad decisions you make can affect your life forever because he is going to be living proof of that. I ask you to let him stay in school and finish his degree, get a job to pay these people back their hard-earned money, do community service and be on a long and strict probation or whatever you see fit. I feel John Tyler can be a

productive person in society because we need those type of people now more than ever in this world, we live in.

Thank you for the opportunity to share the John Tyler I know and once more I beg for mercy for my son.

Sincerely,

Matthew McGaffee
(John Tyler's Father)

September 9th, 2019

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Dear Honorable Valorie Caproni,

My name is Pat Barb, I'm 80 years old and John Tyler was my first grandson. He has always been very close to me throughout his life no matter his age. He has always spent a lot of time with me which I do not get from my other grandchildren. When he was young and we would spend time together, he would always get very involved in his playtime. He loved toy trains and trucks. One thing he would always do is build toy models and spend hours making sure things were perfect or accurate.

John Tyler was very close to my husband, his papaw. As a young boy he was by his papaws side learning to build and operate heavy equipment, always going out with him on his development sites. His papaw taught him to always shake people's hands when introducing himself. He started doing this when he was only 3 years old, which was cute but also telling of the man he wanted to become even at a young age. His mother and I were very involved in his school functions, decorating, observing him in playtime and working with his teachers.

As he grew into his teenage years, he loved the outdoors. He would mow my lawn and help me in the garden. I could tell he enjoyed this opportunity to spend time with me and he took

pride in the landscaping. John Tyler would never ask to run around with the other boys or get into trouble most common high school aged kids do. He wanted to be with his family and expressed this is where he had the most fun, sharing moments with us.

John Tyler always attended a private school and a college preparatory high school. At the end of his senior year and start of college in 2016, my shakes began to worsen. I was first diagnosed with Parkinson's which devastated me and visibly worried John Tyler. He drove home after he learned of my diagnosis and stayed with me for several days helping to ease my worry of this news. After other opinions I learned this was tremors, which he still was worried about. He took time to research other forms of treatment and is always there to help me do anything I need, even if it means him driving or taking time out of his day to do so.

My most enjoyable moments include him taking me to church on Sundays. After this, he always wants to take me to brunch or lunch afterwards and we talk about several things. He loves history and will ask me how things were back in the day, or just about what my week was like. When he left for college, I missed him so much. He lived 5 hours away, but he would still come, unprovoked, and take me to church very often. He called and checked on me when my other grandchildren didn't take the time too. While I love all my grandkids, John Tyler has gone above and beyond the call of a grandchild countless times.

In 2015 he was home for Christmas when his papaw was not doing well. He had an unexpected complication from his past open-heart surgery. On December 30th of 2015 his papaw passed away which was an extremely hard time for all of us. His papaw had been living in Florida and was unable to travel home to see us. We couldn't be with him in his unexpected final hours.

Soon after this in January, John Tyler had to go back to college hours away. He was visibly still grieving the loss of his papaw and was seeking some way to shift the shock of this loss. He reached out and became friends with a few boys I knew of. As time went on John Tyler became so stressed with the loss among other things and started not doing well in school. He relocated in 2017 and things changed for him. His performance improved however it was clear to me that when we would talk, he was off and stressed but I could never tell why.

On April of 2019 the worst possible thing happened, and my daughter shared the news that he had been arrested. She was not informed why, all we knew is that he was being taken away and we were in shock. To this day I cannot get over seeing him go through that and the sheer distress and anxiety that rushed through my body. After his release he discussed with us what happened.

To this day I cannot believe this of my grandson. This is so out of character for him and clearly not the young man I know him to be. I strongly believe based on my deep connection and relationship with my grandson that he got in the wrong crowd and with a person that with just losing his papaw and being away from home, he could not pull away from. Even well-meaning friends can often lead you astray.

He has expressed how deeply sorry he is for all of this and reflected with me the young man he was and now who he wants to be moving forward. I know my grandson has asked God to forgive him for these actions. His future and school are very important to him and he is now doing well and wants to complete his education and expressed a want to pay the people back who were affected which he will.

My dear Judge, I come to you asking for mercy for John Tyler my grandson. I feel in my

heart incarceration is not something that would benefit him or the community. I plead to you to see that alternative sentencing for him would be best knowing him as I do. This young generation could be helped by someone like my John Tyler giving his deeply remorseful testimony to them sharing his experience. Thank you from my heart for taking this time to make yourself more acquainted with my beloved grandson John Tyler.


Respectfully,

Pat Barb

October 3rd, 2019

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007


Re: John Lambert


Dear Honorable Valerie E. Caproni,


My name is Andrea Wilde. I am the co-owner and creative director of a skincare company and I have known John Tyler his entire life. His mother and I have been best friends for nearly 25 years, and John Tyler has referred to me as his second mom over the years.

To say I was shocked to learn of the charges against John Tyler is an understatement. As the mother of two girls, John Tyler has always been the type of young man any mother would love to have a daughter date, and the type of son who never gave his mother any trouble.

I remember during the time John Tyler was involved with Students for Trump, his mother expressed concern to me that he seemed distant and she could tell something was "off". This was highly unusual and out of character for him. In hindsight, it's clear to me that his involvement with the wrong crowd had him doing things that contributed to his pulling away. Knowing John Tyler as I do, I truly believe that it was a guilty conscience that lead to his withdrawal and seeming depression.

John Tyler has always gone above and beyond the call of duty even at a very young age. I remember very well when he was in school at Academy at King he would go out of his way to

help in any way he could. He led the school's media tour when they opened the new campus and on recommendation by the principal, all new students shadowed him at the beginning of the school year.

John Tyler is the kind of young man who is passionate about causes he becomes involved in and has done a lot of volunteer work over the years. Even now, with his sentencing date looming, he continues to do so.

I have spent several hours talking with John Tyler since his indictment and he has fully accepted responsibly for his actions and expressed deep regret for his poor decisions that led to the charges against him. He is sincerely remorseful, and I can't imagine a scenario where prison would be beneficial.

John Tyler has learned invaluable lessons from this experience and would like to move forward with his life. He is currently in college and plans to finish his studies in general business. Following graduation, he plans on pursuing his passion for real estate development. I have no doubt that he will accomplish his goals.

I would be remiss not to mention that I am worried how incarceration would affect not only John Tyler, but his mother, Connie. They have a very close relationship, and this whole ordeal has been devastating for her. I ask that you please have mercy and take into consideration John Tyler's previous history and his relationship with his mother when deciding the best sentencing option.


Respectfully,

Andrea Wilde