L5BHLamS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          19 Cr. 571 (VEC)

5  JOHN LAMBERT,

6                                        Sentence
                Defendant.
7  ------------------------------x

8                                        New York, N.Y.
9                                        May 11, 2021
                                         11:00 a.m.
10

11 Before:

12                HON. VALERIE E. CAPRONI,

13                                        District Judge

14                     APPEARANCES

15 AUDREY STRAUSS
       United States Attorney for the
16     Southern District of New York
   BENJAMIN W. SCHRIER
17     Assistant United States Attorney

18 GARY PETERS
       Attorney for Defendant
19

20

21

22

23

24

25

L5BHLamS

1               (In open court)

2               MR. SCHRIER:  Good morning, your Honor.  Ben Schrier,

3 for the government.

4               THE COURT:  Good morning, Mr. Schrier.

5               MR. PETERS:  Good morning, your Honor.  Gary Peters,

6 on behalf of defendant, John Tyler Lambert.

7               THE COURT:  Good morning, Mr. Peters.

8               Good morning, Mr. Lambert.  Good morning, Mr. Lambert.

9               MR. PETERS:  Good morning, ma'am.

10             THE COURT:  You can have a seat.

11             Mr. Lambert, since I have last seen you, Congress

12 passed a new law, and under the new law, the first time I see a

13 defendant, I'm required to remind the government of its

14 obligation under the Constitution.  So let me take care of

15 that, and then we'll deal with your sentencing.

16             Mr. Schrier, I direct the prosecution to comply with

17 its obligation under *Brady v. Maryland* and its progeny to

18 disclose to the defense all information, whether admissible or

19 not, that is favorable to the defendant, material either to

20 guilt or to punishment, and known to the prosecution.  Possible

21 consequences for noncompliance may include dismissal of

22 individual charges or the entire case, exclusion of evidence,

23 and professional discipline or court sanctions on the attorneys

24 responsible.

25             I have previously entered a written order more fully

L5BHLamS

1  describing this obligation and the possible consequences of

2  failing to meet it, and I direct the prosecution to review and

3  to comply with that order.

4          Mr. Schrier, do you confirm that you understand your

5  obligations and have fulfilled them in this case?

6          MR. SCHRIER:  Yes to both questions, your Honor.

7          THE COURT:  Thank you.

8          Mr. Peters, have you and your client read the

9  presentence report dated October 30, 2019?

10          MR. PETERS:  Yes, we have, your Honor.

11          THE COURT:  Have you discussed it?

12          MR. PETERS:  Yes.

13          THE COURT:  Mr. Lambert, did you read the presentence

14  report?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Did you discuss it with your lawyer?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  Mr. Peters, do you have any objections to

19  the report?

20          MR. PETERS:  I do not.

21          THE COURT:  The presentence report will be made part

22  of the record in this matter and placed under seal.  If an

23  appeal is taken, counsel on appeal may have access to the

24  sealed report without further application to this Court.

25          I received a sentencing submission from the defense

L5BHLamS

dated November 4, 2019, that included letters from the

defendant's parents, his grandmother, and a family friend.  If

anybody here wrote to me, thank you for your letter.

I received a second letter from the defense dated

April 30, 2021, indicating that no restitution had yet been

paid and that since the time of his plea, the defendant has

been a full-time student.

I received a letter from the government dated

November 4, 2019; received a second letter from the government

dated April 28, 2021, explaining why the restitution and

forfeiture amounts were different in this case.

This morning I provided the parties -- we provided the

parties with an updated credit report that I received from

probation.  I had asked the probation department to tell me

whether they had -- there were a couple of hanging chads in the

presentence report.  I had asked them to tell me whether they

had received confirmation from the defendant's schools and his

prior employer and asked them to run an updated credit check.

They did not receive any confirmation from the school or from

the prior employer, and you now have the updated credit report.

I also received a victim impact statement from the

person identified in the complaint as Victim-3.  It was

provided to the defendant on May 3, 2021, and filed on ECF with

the victim's name redacted.

MR. SCHRIER:  Sorry, your Honor.  I just wanted to

L5BHLamS

1    note I think that that person is referred to in the complaint

2    as Credit Victim-1, and it's in the schedule of victims.

3              THE COURT:  I'm sorry?

4              MR. SCHRIER:  Victim-3.

5              THE COURT:  It's Credit Victim-1.  OK.

6              All right.  The next step is the guidelines

7    calculation.  To any family member who is here, anybody on the

8    phone, I apologize.  You're going to think you just dropped

9    into a weird math class, but I'm required to do the guideline

10   calculation.

11             The defendant pled guilty to one count of conspiracy

12   to commit wire fraud.  The presentence report reflects a

13   guidelines level of 16, criminal history category I.  I find

14   the correct guidelines calculation is as follows:

15             I start with the fraud guideline.  Pursuant to

16   2B1.1(a)(1), sets the base offense level at seven.

17             The loss amount is between 40,000 and 95,000.  So

18   pursuant to 2B1.1(b)(1)(D), that's plus six.

19             There were more than ten victims and the crime

20   resulted in financial hardship to at least one victim.  So

21   pursuant to 2B1.1(b)(2)(A), that's plus two.

22             The offense involved sophisticated means and the

23   defendant intentionally engaged in conduct that constituted

24   sophisticated means.  So pursuant to 2B1.1(b)(10), that's plus

25   two.

L5BHLamS

1          The defendant abused a position of public or private

2     trust by posing as an attorney and that facilitated the

3     commission of the offense.  Pursuant to 3B1.3, that's plus two.

4          The defendant pled guilty and accepted responsibility

5     for his actions.  That's minus three.  Bringing us to an

6     adjusted offense level of 16.

7          The defendant has no criminal history, so he has no

8     criminal history points, putting him in criminal history

9     category I.  Level 16, criminal history category I yields a

10    guideline range of 15 to 21 months.

11         Are there any guidelines issues I have not addressed,

12    Mr. Schrier?

13         MR. SCHRIER:  Your Honor, I would just note that

14    probation, I believe, calculated the guidelines range as 21 to

15    27 months because of a disagreement -- or rather, not a

16    disagreement, but they pointed out that a relatively obscure

17    guidelines provision may apply relating to the defendant's

18    provision of false information to victims related to the

19    position of public trust that he was pretending to hold.

20         THE COURT:  I'm sorry.  My PSR shows a guideline

21    range -- offense level of 16.

22         MR. SCHRIER:  If you'll just give me a moment, your

23    Honor.  I apologize.

24         I apologize, your Honor.  I must be mistaken.  I know

25    that the government had noted this in its sentencing submission

L5BHLamS

1    a year and a half ago or so, but perhaps there was a revision.

2           THE COURT:  No, I think what you're referring to is

3    that you, the government, had calculated in the plea agreement

4    the offense level as 14.  Probation calculates it at 16

5    because -- and the difference is the adjustment for the role in

6    the offense.  That's the 3B1.3 adjustment.

7           MR. SCHRIER:  Yes, your Honor.

8           THE COURT:  And I made that adjustment.

9           MR. SCHRIER:  I see.  I apologize, your Honor.

10          THE COURT:  It is obscure, but I concur with probation

11   that it is appropriate.

12          MR. SCHRIER:  Thank you, your Honor.

13          THE COURT:  Mr. Peters, anything from you?

14          MR. PETERS:  No, your Honor.

15          THE COURT:  All right.  I don't see a ground for a

16   departure under the guidelines.  Are there any factual issues

17   in dispute, Mr. Schrier?

18          MR. SCHRIER:  Not from the government's perspective.

19          THE COURT:  Mr. Peters?

20          MR. PETERS:  Not from the defendant, your Honor.

21          THE COURT:  So there's no dispute of the factual

22   recitation in Credit Victim-1's statement?

23          MR. SCHRIER:  Not from the government, your Honor.

24          MR. PETERS:  No, your Honor.

25          THE COURT:  All right.  I have a question.

L5BHLamS

Mr. Peters, your submission indicates that the scheme lasted only about six months, but the government's submission and the presentence report say that the fake accounts were set up in the summer to fall of 2016.  The earliest victim identified seem to have made contact with the fake firm in the summer of 2017, and it appears that a victim was continuing to seek help and maybe still paying in April of 2018.  That seems like about 18 months overall.  Is there any dispute on that?

MR. PETERS:  My recollection, your Honor -- in which part of the sentencing memorandum, because it was -- while it did start in 2016, I think the government alleged there may be some ongoing receipt but not an active work on the website or soliciting for new clients.  That may have been the difference from what I had indicated in the presentencing memorandum.

THE COURT:  I don't know what page it was on.  I didn't write that down.

OK.  There was a victim by the name of Penn Little who had indicated he wanted to be heard.  Is Penn Little here?  No.  Is Penn Little on the phone?

We're going to unmute everybody for just a second.

All right.  Is Penn Little on the phone?

All right.  Is there anybody else on the phone who is a victim who would like to be heard?

All right.  No victim wishes to be heard.

Would the government like to be heard?

L5BHLamS

1        MR. SCHRIER:  Yes, your Honor, briefly.

2        THE COURT:  Before you -- Mr. Schrier, I have a couple

3   of questions if you could address at some point.  One, can you

4   give me a little greater clarity on the efforts that were used

5   to put names to the receipt of money?  Because from the victims

6   I've heard about, it appears that there was email traffic with

7   clients, so I'm curious how they could go unidentified.

8        And second, can you give me any better understanding

9   of how this case came to be?  I'm particularly interested in

10  information that might help inform my analysis of the 3553

11  factor that deals with sentencing disparities between similarly

12  situated defendants.

13       MR. SCHRIER:  Yes, your Honor.  I can just start with

14  the Court's questions.  So the first question related to the

15  mechanism for identifying victims that the government used.  Is

16  that the Court's question?

17       THE COURT:  Well, just sort of the whole effort.  I

18  appreciate the explanation for why restitution and forfeiture

19  are radically different, but given how the scheme operated, it

20  just seems curious that all of the victims couldn't be

21  identified.

22       MR. SCHRIER:  Yes, your Honor.  So it was not the case

23  that the government ever had search warrant returns for, for

24  example, the defendant's email account, which would have

25  allowed the government to identify those communications.  And

L5BHLamS

1    the primary reason for that was following internal discussions

2    at the U.S. Attorney's Office, we determined that the law is

3    ambiguous but does suggest that the victims of Mr. Lambert

4    might actually be able to assert attorney-client privilege over

5    their communications with him because they had the expectation

6    that he was actually a lawyer, and the privilege is held by the

7    victims, not by Mr. Lambert.  So for those reasons, we did not

8    seek Mr. Lambert's emails.

9              THE COURT:  Got it.  OK.

10             MR. SCHRIER:  Instead, the way that we identified the

11   victims in this case was by identifying the primary PayPal

12   account that Mr. Lambert was using to process the funds that he

13   obtained through the fraud.  Those PayPal returns listed at

14   least email addresses, addresses in some occasions, phone

15   numbers, and very often names.  The special agents from the

16   U.S. Attorney's Office assigned to this case then went through

17   the process of attempting to contact the people based on the

18   personal identifying information contained in the returns.  The

19   victim witness coordinator at the U.S. Attorney's Office also

20   mailed out the standard victim notification to all the

21   addresses that were listed in the PayPal returns.  The

22   government made multiple efforts to contact most of the victims

23   in this case and was successful in a number of occasions.  And,

24   indeed, I should have mentioned at the beginning of this

25   proceeding, but there are several victims who are listening in

L5BHLamS

1    today.  But the government was not able to make contact with

2    every single person listed in the PayPal returns.  Perhaps

3    there was outdated contact information, perhaps someone got the

4    notice and declined to participate, but that was the mechanism.

5              THE COURT:  OK.  Thank you.

6              MR. SCHRIER:  Certainly.  In terms of how this case

7    came to be, your Honor is very well familiar with the Centra

8    Tech securities litigation as a result of litigation in this

9    case that was related.  The way that this case came to be was

10   through the Centra Tech case.  So in that case, as your Honor

11   is aware, the government was investigating and prosecuting

12   several individuals who had participated in the creation of a

13   fake ICO, initial coin offering.  In the discovery from that

14   case that was actually provided by the Centra Tech defendants,

15   there were communications with someone purporting to be an

16   attorney who was purporting to advise them on the initial coin

17   offering.  This raised a number of red flags for the

18   government, and it did appear as though the Centra Tech

19   defendants were going to try to advance some sort of good faith

20   reliance on the advice-of-counsel defense at trial.  So the

21   government started looking further into this attorney and

22   quickly determined that this attorney did not appear to be a

23   legitimate attorney.  A separate investigation was then

24   initiated into the contact of the person posing as Eric Pope

25   from the Pope & Dunn law firm, and here we are today.

L5BHLamS

1          THE COURT:  All right.  Go ahead.

2          MR. SCHRIER:  Yes, your Honor.  So the government just

3    wanted to add several points, some of which relate to events

4    that occurred since the government submitted its sentencing

5    submission.

6          As your Honor just noted, the guidelines range is 15

7    to 21 months.  That is the sentence that the government is

8    recommending, but I wanted to stress that the most important

9    recommendation that the government is making is that there is

10   some form of incarceratory sentence.  I know from previous

11   appearances before the Court that the Court is very well aware

12   of the literature relating to the deterrent effect of any

13   amount of time in prison versus no time in prison, so the

14   government does think that in this case some type of

15   incarceratory sentence is very important for both specific and

16   general deterrence perspectives.

17          I also wanted to emphasize something that the

18   government touched on in its sentencing submission, was how

19   especially vulnerable the victims were in this case.

20   Mr. Lambert went on a platform, Upwork, that people who are not

21   the most sophisticated consumers of legal services use.  That's

22   the whole premise of Upwork, and Mr. Lambert certainly knew

23   this.  It's not as if he was pretending to provide legal

24   service to sophisticated large multinational corporations.

25   These were individuals.  These were small businesses.  This was

L5BHLamS

1    in many cases the only way that they knew how to find a lawyer,

2    and to find a lawyer that they could pay for.  This is not an

3    incidental feature of the scheme.  This is core to the entire

4    premise of the scheme.  The scheme would not have worked if

5    Mr. Lambert had sophisticated -- had solicited sophisticated

6    companies.  So I think that's really important to keep in mind

7    here.  Mr. Lambert was intentionally and specifically targeting

8    vulnerable, relatively unsophisticated consumers of legal

9    services.  When I say "unsophisticated," I don't mean it in a

10   pejorative way.  I just mean people who are not familiar with

11   the legal system necessarily and how one goes about retaining a

12   legitimate lawyer.

13           I think that the person who is identified in the

14   complaint as Credit Victim-1 and the person who is the same

15   person who submitted the victim impact statement to the Court

16   recently, I think that person is the perfect embodiment of the

17   vulnerable victim that Mr. Lambert targeted.  Credit Victim-1's

18   life was fundamentally and perhaps permanently negatively

19   affected by the actions of Mr. Lambert.  Mr. Lambert went so

20   far as to have Credit Victim-1 drain his 401(k) account.  And

21   Mr. Lambert could not have known this at the time, but that

22   money became particularly important, or the lack thereof, for

23   Credit Victim-1 during COVID.  He did not have that to fall

24   back on, and he suffered a very significant financial hardship

25   as a result.  In addition to Credit Victim-1's credit -- excuse

L5BHLamS

1   me, victim impact statement, there are also communications

2   between Mr. Lambert and Credit Victim-1 in which Credit

3   Victim-1 is explaining that he was unable to get a job that

4   would have completely changed his life, that would have allowed

5   him to make significantly more money because his credit issues

6   remained unresolved.  Instead of taking steps to find a real

7   lawyer for Credit Victim-1, for example, Mr. Lambert asked him

8   to continue paying more money, knowing that he was never going

9   to fix the credit problems that Credit Victim-1 was

10  experiencing.

11          Lastly, I just wanted to note the chaotic nature of a

12  fraud like this or, rather, the chaos that it engenders.  If

13  you just look at the docket in this particular case, this

14  should have been a relatively straightforward prosecution in

15  many ways because Mr. Lambert did plead guilty quite quickly,

16  but if you look at the intervening victim motions and the

17  related Centra Tech litigation and the intervention by

18  Mr. Little and all of the filings that have had to take place

19  in this docket because of the chaos that Mr. Lambert sowed, it

20  taxed an overburdened criminal justice system in addition to

21  how pernicious the fraud was.  Obviously, the victims are the

22  most important aspect of all of this, but it just goes to show

23  how damaging and dangerous a fraud like this is.  It creates

24  chaos in every corner of the world that it touches.

25          So, for those reasons, the government believes that a

L5BHLamS

1   guideline sentence of 15 to 21 months' incarceration is

2   appropriate here.

3              THE COURT:  Thank you, Mr. Schrier.

4              Mr. Peters.

5              MR. PETERS:  Yes.  Can I use the --

6              THE COURT:  You may.

7              MR. PETERS:  I apologize if my glasses -- I'm still

8   not used to getting them fogged up, but I'm sure everybody says

9   the same thing.

10             THE COURT:  I know.

11             MR. PETERS:  My name is Gary Peters, and I'm

12  presenting on behalf of John Tyler Lambert.  In court today is

13  his mother Connie.  We had our sentencing submission.  It's

14  been over a year and a half.  And as to Mr. Schrier's last

15  comment, I think had we been able to go without the Centra Tech

16  intervention and others, it wouldn't have been nearly as

17  chaotic as he refers to.

18             Most of our arguments in the sentencing submission are

19  there.  We supplied them, and what I'd like to do is just

20  highlight a few areas that I think are critical.  Because when

21  this started, Mr. Lambert was 20 years old; he was going to

22  school; it was first time away from home; and he ended up, with

23  his coconspirators, it turns out, trying to develop a web

24  marketing company, which he did.  Unfortunately, that turned

25  from a web marketing company into a fake law firm, complete

L5BHLamS

with fictitious biographies of lawyers.  They claimed to be

located in Manhattan and claimed to provide legal services to

the public.  Obviously, none of that was true, and Mr. Lambert

quickly admitted to that when he was arrested.

Now, he and his partner claimed to be attorneys Eric

Pope and Gregory Shapiro.  His partner grew up in New Jersey,

but always liked to say he was from Manhattan and thought that

would be the best thing to do to attract clients, pretend

you're from New York, which none of that was true, obviously.

So on April 19, at least a year after the time they

had finished conducting the fraud and the scheme, he was

arrested one morning and obviously was not sure exactly what it

was for, but he took immediate responsibility for it.  In fact,

he took responsibility not only for himself but for his

coconspirator.  One of the issues when I was first contacted

was merely to come before the Court to assist him with the plea

agreement.  And when I heard that his claim to fame was as a

co-founder of Students for Trump, I immediately contacted my

partner with referral and said:  I don't know how we can

represent somebody that's a student for Trump person.  How are

we going do this?

Well, I had a discussion with John Tyler very quickly

and understood his agreement to take responsibility for it.  He

was very ashamed of what he had done, and he was willing to

plead guilty and wanted to know how to do that.  And he was

L5BHLamS

willing to come forward, plead guilty, and accept his

responsibilities.  The only thing that had anything to do with

the Students for Trump in 2016 when he was a co-founder was

that he met his coconspirator there, but other than that, it

didn't have anything to do with that.

John Tyler has been ridiculed, as set forth in our

sentencing memoranda, in the press, online.  You can go from

Politico to The Young Turks and take a look at the type of

ridicule that he's gone under, and he has demonstrated his

remorse by pleading guilty, knowing that he's going to spend a

good portion of his life not having a number of civil

liberties.  He won't be able to vote in most cases, he won't be

able to own a firearm, and he's most likely going to have this

on his record forever in terms of prospective future

employment.  In most states he will never be able to be

licensed in a position of trust, whether that goes from lawyer

to accountant to others.  He understands that.  During the time

that he's been on probation, he's been going to school

full-time, working one day a week, volunteering working with

the elderly.

As you indicated, he had just his -- the four letters

that were submitted from his mother Connie, his dad Matt, his

grandma Pat Barnes, and a close family friend.  Normally, when

you have somebody older, you would have 20 or 30 types of

letters, but in this case, as a young man, it was his family.

L5BHLamS

1          I believe that John Tyler knows the nature of the

2     offense, the offense that he committed.  He knows the impact

3     that that's going to be.  And I can tell you three or four

4     years ago he never thought this would be where his life was

5     going, but he's willing to take the consequences that your

6     Honor may deem appropriate and move on with his life to be a

7     better individual and a better person, because his life now is

8     a far different direction than he would have thought of two or

9     three years ago.  He'll start after sentencing, and once that's

10     over his long journey towards making amends not only to his

11     family but to the community.  We think that that will be

12     something that he is focused on, something that he wants to do,

13     and something that he will show.

14          Your Honor, I know in terms of the scope of your

15     sentencing letter, while you're statutorily obligated to look

16     at all the sentencing guidelines, and we agree to those, it's

17     important to individualize the sentence.  And we think in this

18     case a sentence that does not include incarceration would be

19     appropriate.  We detail in our sentencing memoranda the

20     prospective impact of his youth when he did this.  He was in

21     his early 20s when he did illegal contact.  As he talked to the

22     probation officer, he indicated that one of the reasons he may

23     have been influenced was watching TV shows such as "Suits"

24     where you see paralegals acting as attorneys and getting away

25     with it.  It does not under any circumstances require that he

L5BHLamS

not be punished for it, but it just shows the age and the earliness for it.

We're hoping that you agree that an alternative to incarceration will be appropriate in this case.  We'd like to do that for a number of reasons:  One, as recommended in the sentencing report, John Tyler's shown compliance during the terms of his probation.  He's worked full-time and school.  He's worked with the elderly on a weekly basis.  And what we're hoping is that as part of his sentence that he would have home confinement; that he would be required to do some community service, which would include giving presentations to young people to groups, to civic groups, community leaders about his experience because we're hopeful that if he can share his experience with the impact his life would have -- on his life by making the choice that he made to create the law firm and to break the law, that he might be able to help others change their lives.  And he's good at this.  He was on TV during the Students for Trump days.  He's articulate.  We think he would be able to explain the perils of trying to pretend to be a lawyer or to break the law and the significant consequences that would occur.

So as set forth in the recommendation by the probation department, they feel that at least as to specific deterrence, that there's been a significant amount of evidence that, in fact, he will be specifically deterred.  The question then

L5BHLamS

1    becomes, as Mr. Schrier pointed out, is there going to be any

2    general deterrence if you were to provide him a noncustodial

3    sentence?  And we think the answer to that is yes.  The offense

4    was conducted when he was first away at school, when he was

5    young.  He was involved with Students for Trump.  The severe

6    penalty and the severe publicity that accompany that have been

7    very great and have shown people that, in fact, breaking the

8    law will not be tolerated even if you are not incarcerated.

9    His crime has received extensive publicity, and our hope is

10   that it will provide the general deterrence if this Court were

11   to agree to a noncustodial sentence.

12        So while we have looked at some alternatives, we

13   believe one requirement for John Tyler to give presentations to

14   a significant number of persons, even in the time of COVID, can

15   be arranged, and we believe that that would provide, hopefully,

16   at least one person, if not more, to keep them from violating

17   the law based upon his own experience.

18        With that, if it would please the Court, John Tyler

19   would like to say a few words.

20        THE COURT:  I want to hear from John Tyler,

21   Mr. Lambert, but let me -- I have a question.  Can you shed any

22   light on his school situation?  You've repeated several times

23   that he's been a full-time student.  Not clear to me whether

24   that means he's been taking a full load or not, but he's been

25   in college since 2015, and I know that graduating in four years

L5BHLamS

1   has sort of gone the way of the dodo bird, but we're talking

2   now many years.  And you told me that he's been in school since

3   he pled, which means that's five semesters just since he pled.

4          MR. PETERS:  I would have to ask him.  I know he's

5   been taking online classes.  I'm not sure.  I think it was 12

6   hours per semester.

7          THE DEFENDANT:  Yeah.

8          THE COURT:  Is that a full load?

9          MR. PETERS:  It's a full load in today's world.

10          THE COURT:  Is that a full load?

11          THE DEFENDANT:  Your Honor, that's -- I'm a full-time

12   student.  However, due to different financial situations,

13   that's all I was able to currently take, but that is a full

14   load, your Honor.

15          THE COURT:  All right.  So he's been going to school

16   with a full load, and yet we're talking he's going on six years

17   in college?

18          MR. PETERS:  Well, I know that he left when this

19   occurred, and that would have been -- he was already out of

20   school in 2018.  Is that correct?

21          THE DEFENDANT:  Yes.  I took a short break in between,

22   your Honor.  So I've not been going from 2015 to now

23   continuously, however.  But after my break, I started again,

24   your Honor.

25          THE COURT:  In 2019?

L5BHLamS

1            THE DEFENDANT:  Yes, your Honor.

2            THE COURT:  OK.  Are his parents paying for college?

3            MR. PETERS:  Yes.

4            THE COURT:  OK.

5            MR. PETERS:  Because, obviously, he will not be

6    allowed to participate in any federal student loans because of

7    his felony criminal conviction.  So they will assist him with

8    that or he will continue to work or begin working to help.

9            THE COURT:  All right.  Thanks.

10           All right.  Mr. Lambert, would you like to be heard?

11           THE DEFENDANT:  Yes, please, your Honor.

12           THE COURT:  If you're going to read something, I'm

13   going to ask you to read slowly.

14           THE DEFENDANT:  Yes, your Honor.

15           THE COURT:  The court reporter has to get it all down.

16           THE DEFENDANT:  Thank you for the opportunity to

17   speak.  I want to begin first by expressing my sincere regret

18   and apologies to the victims who were affected by my actions.

19   The scope of the potential damages and seriousness of my

20   actions is something I was ignorant of when this all began.  I

21   have felt the full effect of the seriousness of this matter,

22   which has left my soul broken of sins I've committed.

23           This began while in college volunteering, involving

24   myself in student activism.  It is there where I met my

25   coconspirator in this scheme.  The coconspirator and I aspired

L5BHLamS

at a time to pursue law and thought in our young, ignorant
minds that we could begin to learn and interact in the field
before receiving the proper education.  This was a grave
mistake, certainly.  When I made this choice, I did not
understand the impact it would have nor the damage it could
cause others.  As I made a choice to be involved and exchanged
money for services I could not fully perform, I began to see
that individuals had the potential to be hurt, and it was not
something minor.  I was raised to have a strong content of
character.  However, in the moment leading up to the decision
to contribute in this scheme and my decisions that follow the
time I took part in this, I lost focus on who I was.  I
understand now that my ignorance was a disrespect to the law
and my country.

I should have made a better choice to not take part of
this, not to contribute.  However, I did not.  This lapse in
proper decision-making led me to be a violator of the law and
someone who is not a contributor to society.  I let my family
down, my creator down, and many who love, care, and believe in
me.  The only thing I can do now is express a sincere
understanding of my wrongdoing, my firm intent to correct my
actions by service, paying back the victims swiftly, and an
overwhelming sense of responsibility to educate other young
adults so they may not make the poor decisions that I did.

My poor decisions have led to grave pain to both

L5BHLamS

1    myself and my family.  This process has seemed suffocating, one

2    that has stripped me of feeling human.  I say this not for

3    sympathies, as I know I made the choices that landed me in this

4    position.  Instead, I pray you will understand the impact this

5    has had on both my demeanor, character, goals, and overall

6    frame as a young man.  My life will be forever marked by this

7    poor choice at a young age.

8            I know that there is much left for me to do to express

9    my sorrow and regret in these choices, along with paying back

10   the debt to victims and my society.  Words are not enough.

11   From the time I was indicted, I have taken conscious action in

12   my life to try to right the ship to show I have taken this

13   seriously.  I have become close to my savior, began to

14   volunteer diligently, and have spent countless hours in prayer

15   to rid myself of the demons that would allow someone to make

16   these poor choices in the first place.

17           Thank you for your allowing me to speak.

18           THE COURT:  Thank you, Mr. Lambert.

19           Mr. Lambert, federal law requires me to consider the

20   nature and circumstances of your offense and the history and

21   characteristics of you.  You're a 25-year-old college student.

22   You grew up in Blountville, Tennessee, as an only child.  Your

23   mother remarried when you were a child, and you report a

24   positive relationship with your stepdad.  You were educated, as

25   far as I can tell, entirely in small private schools,

L5BHLamS

ultimately completing high school online at a school affiliated
with Liberty University.  You then went to Campbell College, a
very small college in North Carolina.

You were active in the 2016 election, including being
a member of the college Republican National Committee and being
a co-founder Students for Trump.  At that time you were about
20 years old, and you seemed to be quite comfortable sitting
for interviews with all types of media organizations.  You had
a summer job when you were 20 for a couple of months, but
otherwise you are 25 years old, and you have absolutely no
employment record.  You are not married, and you have no
children.

The defense submission, as well as you have said
during your oral statements, say that you are remorseful, but I
would note that you have made no effort to repay your victims.
Restitution will be ordered as part of sentencing, but if you
were truly remorseful, it's hard to understand why you didn't
make some effort to get a job to start to repay the victims.
Going to school 12 hours is more than enough time for a
part-time job.  You may not have had the ability to repay
everything, and school is clearly quite important, but I am
struck by your failure to do anything at all to start to make
amends to the victims of your crime.

Taking all that into account, federal law requires me
to impose a sentence that is reasonable, and no greater than

L5BHLamS

necessary, to accomplish the goals of sentencing.  I've

considered all of the required sentencing factors, as well as

the guidelines.  In terms of what is most important, we start

with the seriousness of the offense.  Fraud is unquestionably a

serious offense, although this is not the most substantial

fraud case that I have seen in terms of how much money it

managed to collect from its victims, but it has other aspects,

Mr. Lambert, that makes it more serious than some fraud cases.

This crime took a lot of thought.  Despite the defense

submission and the letters from family members that presented

you as a naive, sheltered young adult who was led astray by

your coconspirator, this crime involved a lot of planning and

sophisticated thought.

        Mr. Lambert figured out a way, figured out that if he

was going to portray himself as a New York lawyer, he needed to

be able to utilize multiple phone numbers that appeared to be

New York numbers.  He advertised his legal services.  He

created a website and created -- and generated false

biographies.  In short, he did not just make a mistake and

stumble into misrepresenting himself to be an attorney.  He

spent a lot of time and effort to create a cyber existence that

he believed would be credible enough to fool people who were

unlucky enough to hire him.

        It's also more serious for the reasons that the

government laid out, because the business model of the fraud

L5BHLamS

1    was calculated to ensnare as victims people who were not

2    sophisticated purchasers of legal services.  And as indicated

3    in the victim impact statement of Credit Victim-1, Mr. Lambert

4    was not a passive recipient of legal fees.  He got his victims'

5    credit card numbers and regularly charged fees to them.  That

6    same victim was pressured to do the unthinkable.  He tapped

7    into a 401(k) account to generate cash to pay Mr. Lambert for

8    his alleged legal services.

9            Without knowing the underlying story of all of the

10   victims, the facts surrounding that victim demonstrate the

11   falsity of the defense narrative:  Mr. Lambert was just a naive

12   guy trying to learn the law and help people out.  That victim

13   needed help with a credit reporting bureau.  Mr. Lambert took

14   his money and said he would straighten it out, but he did not

15   even bother to call the credit reporting bureau.  Who knows?

16   It could be that if you had even bothered to pick up the phone

17   and make a phone call in exchange for the thousands of dollars

18   you were receiving and continued your charade of saying you

19   were a lawyer, that would have been enough to elevate that

20   particular dispute in the credit agency high enough to someone

21   who maybe could have corrected whatever the problem was that

22   that man was having.  But far from trying to help that victim,

23   Mr. Lambert took his money and did nothing.  In the end, when

24   the victim was emailing desperately trying to figure out what

25   to do, Mr. Lambert, who by that point had allegedly realized

L5BHLamS

that it was not a good idea to pose as a lawyer, did not even

have the common decency to make up an excuse to tell the victim

to get another lawyer.  After getting money from his 401K

account, Mr. Lambert just ghosted the victim.  That is many

things, and maybe Mr. Lambert has a heart of gold in some

aspects of his life, but that is evidence of a cold-blooded

fraudster who cared not a whip about the victims of his fraud.

          I've considered the need to promote respect for the

law.  Mr. Peters stresses that Mr. Lambert had no criminal

history as evidence, I think, that he has respect for the law

and this whole criminal enterprise is just, as his family

repeatedly characterizes it, a mistake that happened when he

was led astray by others.  Based on what I have before me, I do

not agree with that characterization.  The defendant started

engaging in criminal conduct when he was just 20 years old, and

he stayed at it for months.  To me, that suggests an early

attraction to getting something for nothing, for scamming

people to get people -- to get money instead of working hard to

get what you need or want.  When someone is 50 and has no

criminal history, that suggests the criminal conduct is truly

aberrant behavior.  In contrast, the fact that this crime was

committed just about as soon as Mr. Lambert was old enough to

commit a fraud crime suggests that this is not aberrant

behavior on the part of this defendant.

          I've considered the need to provide -- to impose just

L5BHLamS

punishment while avoiding unwarranted disparities.  In the

defense submission, he points to -- the defendant points to his

coconspirator who was not prosecuted as an argument for a

non-jail sentence.  But, of course, the primary difference was

that the coconspirator cooperated with the government.

The defendant also points to other fraud cases where

much more money was involved and where there were downward

departures or downward variances.  He points specifically to

the sentence of Keith Schuler who was sentenced to supervised

release with a special condition of community service, talking

about what he did to college students, and the like.

Mr. Schuler is not analogous to Mr. Lambert because, first, he

had an entire adulthood where he committed no criminal conduct,

and second, he was a cooperating witness who testified against

his friends.

I've considered the need to deter criminal conduct.

Mr. Lambert, the law requires me to consider two aspects of

deterrence: general deterrence and specific deterrence.

General deterrence is how do we deter society generally from

committing crimes, and specific deterrence is how do we deter

you from committing another crime.  In terms of general

deterrence, it is not entirely clear what general deterrent

effect any sentence will be in this case, but it may very well

be that a sentence will deter other young people who are

tempted to dabble in fraud, thinking that their youth will

L5BHLamS

1    protect them from any serious consequence of their actions.

2            But I think what's more important in connection with

3    this sentence is specific deterrence.  It is important to send

4    a message to this defendant.  As much as his family may wish to

5    embrace the narrative, Mr. Lambert, you cannot foist this off

6    on being led astray by your coconspirator.  By all indications,

7    you have a mind of your own and can stand up to people with

8    unpopular opinions if it is important to you to do so.  As the

9    defense noted, you were an early supporter of Trump at a school

10   that at the time shunned Trump.  You had the force of

11   personality to overcome that and to set up a nationwide

12   organization in support of your preferred candidate.  Those are

13   the actions of a leader, not a follower.  In my view, a leader

14   who has shown willingness from a young age to commit crimes

15   poses a particularly high risk of recidivism.

16            Everybody doesn't have leadership skills, Mr. Lambert.

17   Leadership skills can be used for good or for ill.  So far, you

18   have used your skills to build a dynamic political group.

19   That's a good thing.  You brought young people into the

20   political world, and I can't say anything other than that is a

21   wonderful thing, to keep young people engaged in our

22   government, and you used your leadership skills to do very bad

23   things, to construct and to run a fraud scheme.  That part of

24   Mr. Lambert has to get the message that this conduct or

25   anything close to it is entirely unacceptable.

L5BHLamS

1          Mr. Lambert, you need to understand that if you

2   continue to use your talents to commit crime, you can count on

3   spending substantial amounts of time in federal prisons.

4          Protection of the public is not -- normally I think of

5   this factor in terms of physical protection, how do we protect

6   people from violent crime, but protection of the public is a

7   concern in terms of people who will fall prey to scams like

8   this, if you come up with other fraud scheme to make money

9   rather than by earning it honestly.

10          I don't think the need to provide the defendant with

11   educational or vocational training is a significant factor.  He

12   has not yet graduated from college, but he seems to be well on

13   his way.  He can choose either to finish college or to learn a

14   trade.

15          Based on all of my considerations of the sentencing

16   factors, I find that the guideline sentence is somewhat longer

17   than necessary to achieve the goals of sentence, and therefore

18   I am going to vary downward.  But I find that the sentence

19   recommended by the probation department and urged by the

20   defense to be inadequate to achieve the goals of sentence.

21   Therefore, I am not going to vary downward to a non-jail

22   sentence.

23          Mr. Lambert, I'm going to sentence you to the custody

24   of the attorney general for a period of 13 months, to be

25   followed by a period of supervised release of three years.

L5BHLamS

There are mandatory conditions of supervised release.  You must

not commit another crime.  You must not illegally possess a

controlled substance.  You cannot possess a firearm or other

destructive device.  You will not be subject to mandatory drug

testing because I find the risk of drug abuse is low.  You must

cooperate in the collection of DNA.

In addition to the standard conditions of supervision,

I'm imposing the following special conditions:  The defendant

must provide the probation office with access to any requested

financial information, and you must not incur new credit

charges or open additional lines of credit without the approval

of the probation office unless you are in compliance with the

installment payment schedule.

The defendant must report to the nearest probation

office within 72 hours of release from custody, and he'll be

supervised by the district of residence.  I am not imposing a

fine, because I find there's no ability to pay a fine, and any

resources that Mr. Lambert has at his disposal can better be

spent repaying his victims.

It was a consent order of forfeiture.  I am ordering

forfeiture in the amount of $46,654.50.  And I'm ordering

restitution to the people on the schedule that's attached to

the restitution order in the amount of $21,337.

Probation is recommending that Mr. Lambert be required

to pay 10 percent of his gross monthly income towards his

L5BHLamS

1    financial penalties.  Does either side want to be heard on

2    that?  Mr. Schrier?

3              MR. SCHRIER:  Nothing from the government on that,

4    your Honor.

5              THE COURT:  Mr. Peters?

6              MR. PETERS:  Nothing, your Honor.

7              THE COURT:  All right.  Mr. Lambert has no dependents,

8    so I'm going to order him to pay 15 percent of his gross income

9    towards financial penalties.  If his income substantially

10   increases, the government can seek a larger percentage.  If he

11   ends up with dependents, the defense can ask that the

12   percentage be decreased.  I must impose a $100 special

13   assessment.

14             Mr. Peters, do you have any requests for designation?

15             MR. PETERS:  Your Honor, if possible, because of where

16   his grandmother lives, either Pensacola or Montgomery, Alabama,

17   would be areas where his grandmother may be able to --

18             THE COURT:  Pensacola or?

19             MR. PETERS:  Montgomery, Alabama.

20             THE COURT:  Montgomery.  OK.  I'm happy to make that

21   recommendation.

22             Mr. Lambert, understand, all I can do is recommend.

23   It's ultimately up to the Bureau of Prisons what facility

24   they're going to put you in, but I will recommend that they

25   designate you to either Pensacola or to Montgomery.

L5BHLamS

1        Does the government have a position on direct

2    surrender?

3        MR. SCHRIER:  Your Honor, this is not a mandatory

4    remand statute, and the government has no objection to a

5    self-surrender.

6        THE COURT:  All right.  Mr. Lambert, you're directed

7    to surrender to your designated institution not later than noon

8    on June 25, 2021.  If no facility has been designated by that

9    date, you must surrender to the Southern District of New York

10   marshals.  If you're not yet vaccinated, I have set the

11   surrender date to give you time to be fully vaccinated for

12   COVID.  For that reason, COVID and the presence or absence of

13   COVID in your designated facility will not be a basis for you

14   to request a delay in your surrender date.  I strongly

15   recommend that you take advantage of the vaccine and get

16   vaccinated before you are required to surrender to prison.

17        Are there any open counts in this case?

18        MR. SCHRIER:  Just in the complaint, your Honor, but

19   not in an information or an indictment.

20        THE COURT:  All right.  Mr. Lambert, to the extent you

21   have not given up the right to appeal your sentence through

22   your plea of guilty and the agreement you entered into with the

23   government in connection with that plea, you have the right to

24   appeal your sentence.  If you're unable to pay the cost of an

25   appeal, you may apply for leave to appeal *in forma pauperis*.

L5BHLamS

1    The notice of appeal must be filed within 14 days of the

2    judgment of conviction.

3            Anything further from the government?

4            MR. SCHRIER:  No, your Honor.

5            THE COURT:  Anything further from the defense?

6            MR. PETERS:  No, your Honor.

7            THE COURT:  All right.  Thank you all.

8            Good luck, Mr. Lambert.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25